KNIGHTS OF THE MODERN MACCA-
BEES v. GILLIS et al.

(Court of Civil Appeals of Texas. Austin.
Jan. 24, 1912. Rehearing Denied
Feb. 28, 1912.)

1. APPEAL AND ERROR (§ 1003*) — VERDICT
CONTRARY TO EVIDENCE.

If a verdict is clearly wrong and mani-
festly against the weight of the evidence, it
is the duty both of the trial judge and the ap-
pellate court to set it aside.

[Ed. Note.—For other cases, see Appeal and
Error, Cent.Dig. §§ 3938–3943; Dec.Dig. § 1003.*]

2. INSURANCE (§ 819*)—MUTUAL BENEFIT
INSURANCE—EVIDENCE—SUFFICIENCY.

In an action on a benefit insurance certif-
icate, evidence examined, and held insufficient
to support a finding by the jury that two as-
sessments were paid before the insured had
been suspended for nonpayment of assess-
ments.

[Ed. Note.—For other cases, see Insurance,
Dec. Dig. § 819.*]

Appeal from District Court, Bosque Coun-
ty; O. L. Lockett, Judge.

Action by Mary F. Gillis and another
against the Knights of the Modern Macca-
bees. From a judgment for plaintiffs, de-
fendant appeals. Reversed and remanded.

J. B. McIlwain and Cureton & Cureton, for
appellant. Odell & Johnson and W. F.
Schenck, for appellees.

KEY, C. J. Appellee Mary F. Gillis, join-
ed by her husband, A. W. Gillis, brought this
suit upon a beneficiary certificate or insur-
ance policy, issued by appellant to Furman
A. Gillis, and payable at his death to his
mother, Mary F. Gillis. The defendant's an-
swer included a general denial and a special
plea, not necessary to be set out. The case
has been tried several times, and at the last
trial resulted in a verdict and judgment for
the plaintiffs, and the defendant has appeal-
ed. At the last trial the case was submit-
ted to the jury upon a written agreement of
the parties, together with certain other tes-
timony. The fifth and sixth paragraphs of
the agreement referred to read as follows:

"(5) That the said Furman A. Gillis, or
his representatives, paid all assessments lev-
ied, except assessments 134 and 135. That
assessment 134 was duly levied by defend-
ant, and notice thereof given in the manner
as provided by defendant's laws, and became
due October 1, 1906, and the last day of pay-
ment thereof was October 30, 1906. That as-
sessment 135 was duly levied by defendant,
and notice thereof given in the manner as
provided by defendant's laws and became
due November 1, 1906, and the last day of
payment was November 30, 1906. That un-
der defendant's laws, if either of said as-
sessments were not paid on or before the
last day as above set forth, the said Fur-
man A. Gillis stood suspended, ipso facto,
from all rights and benefits under said cer-
tificate and could only reinstate in case of
suspension and become in good standing by
the payment of said assessments and by fur-
nishing a certificate that he was in good
health.

"(6) It is agreed that the subject-matter of
the controversy in this suit is whether as-
sessment 134 was paid to the defendant, or
to some one duly authorized to receive the
same for the defendant on or before Octo-
ber 30, 1906, and whether assessment 135
was paid to the defendant or to some one
duly authorized to receive the same for the
defendant on or before November 30, 1906;
the plaintiffs contending and agreeing to ten-
der proof to show that the same were paid
within the time above specified; the defend-
ant denying payment of the receipt of the
money by it or by any one duly authorized
to receive the same for it, and claiming that
if the insured or any one for him paid as-
sessments 134 and 135, they were paid after
the dates above set forth respectively, and
at a time when the assured stood suspended
from all rights and benefits of the order,
and could not reinstate without, in addition
to the payment of such assessments, furnish-
ing a certificate of good health, and that on
and after October 30, 1906, the insured was
not in good health and could not furnish the
certificate of good health and did not fur-
nish any."

[1] We overrule all the assignments of er-
ror presented in appellant's brief except the
one which challenges the verdict as being
contrary to and unsupported by the testimony.
We hold that the court did not err in re-
fusing to give the special instructions re-
quested by appellant and set out in its brief.
While decisions made in other jurisdictions
and cited by appellant seem to support the
contentions urged, it seems to us that the
charges referred to, if given, would have in-
fringed upon the statute of this state which
prohibits a trial judge from commenting up-
on the weight of testimony. But a careful
consideration of the statement of facts has
forced upon us the conclusion that the ver-
dict of the jury is not supported by satis-
factory evidence, and is so contrary to the
overwhelming weight of the testimony that
the trial judge committed error when he re-
fused to set it aside and award a new trial.
While it is true that when a case is sub-
mitted to a jury that body, in so far as its
action is concerned, is the exclusive judge
of the credibility of witnesses, still, if the
verdict rendered by the jury is clearly wrong
and manifestly against the whole weight of
evidence, it is not only the duty of the trial
judge, but also of the appellate court, to
set the verdict aside. Willis v. Lewis, 28
Tex. 191; Chandler v. Meckling, 22 Tex. 41;
Dimmitt v. Robbins, 74 Tex. 441, 12 S. W.
94; M. P. Ry. Co. v. Somers, 78 Tex. 441,
14 S. W. 779; Railway v. Brice, 111 S. W.

1094; Railway v. Ives, 34 Tex. Civ. App. 53, 78 S. W. 36.

[2] The controlling issue in the case was whether assessment 134 was paid on or before October 30, 1906, and 135 was paid on or before November 30, 1906. If either of these assessments was not paid by the time referred to, the plaintiffs were not entitled to recover, and the burden rested upon them to furnish proof of the time of such payments. The plaintiffs claim that they were both paid at the same, time, to wit, October 8, 1906; and, unless the proof shows such payment, the verdict is not supported by testimony, and appellant's motion for a new trial should have been granted.

We shall first consider certain undisputed nd conceded facts. On November 27, 1906, W. G. Bell, a deputy of appellant, was at Morgan, and, finding the local lodge in a disordered condition, took up the records and blank receipt books and carried them away with him. It is admitted by the plaintiffs that this occurred on November 27, 1906, and that date is of vital importance in considering the weight to be given to Mr. Gillis's testimony, which will be hereafter discussed. On the 11th day of December, 1906, O. D. White, acting as finance keeper of defendant, undertook to remit to the defendant for Furman Gillis and himself assessments 134 and 135. This was done by writing a letter to the secretary of defendant and inclosing a draft issued by the bank in Morgan. In that letter Mr. White said, "I was out of town when Mr. Bell was here the other day." Appellant replied to that letter under date of December 17, 1906, stating that a certificate of health was necessary in order to reinstate Furman Gillis and himself. No certificate of health was furnished as to Furman Gillis, and no further correspondence occurred in reference to him until after his death, which occurred January 15, 1907, and the proof of death was not presented until June following. The proof of death contained two affidavits, one made by Mrs. Gillis, the plaintiff, and the other by O. D. White, finance keeper of the local lodge. Mrs. Gillis stated in her affidavit that assessments 134 and 135 were paid December 1, 1906, and O. D. White stated in his affidavit that they were paid November 1, 1906. Attached to the proof of death were four receipts, given on Maccabee blanks; one being a receipt for assessments 134 and 135, and dated November 1st. It was shown by uncontroverted testimony that, while a Maccabee printed receipt was used in its preparation, it was of a different type from the Maccabee blanks used in making out the other receipts. Mr. Bell, the district deputy, who had general supervision of the field work, testified as follows: "When I went there I did take away the books and papers of the tent; that is, the receipt book and the cashbook of the Bosque tent of the Maccabees there at Morgan. That was on the 27th day of November. The receipt book was a blank book, made out for general use as a receipt book, and about half of it had been used I suppose. The receipt book was similar to the one you show me here, Exhibits J and K. It was one of these books. It was Exhibit K. This Exhibit K is the particular receipt book that I took up that time when I was at Morgan. After I took up this book, Mr. White, the finance keeper, nor no one so far as I knew, connected with the order at Morgan, had any book, receipt book, like this belonging to the order. I don't think receipt Exhibit M came from this receipt book Exhibit K at all. The printing on Exhibit M does not correspond with the receipts in Exhibit K. The words, 'Received of Sir Knight,' are of a different print altogether. (At this point counsel for defendant offered to the jury for inspection the receipts in Exhibit K and receipt Exhibit M.) The receipt book marked 'Exhibit J' is the one they had at Morgan prior to that time. That is, that is the book Mr. Belcher had when he was finance keeper prior to the time Mr. White was finance keeper." The receipt marked "Exhibit M" was for assessments 134 and 135.

At the first trial of the case Mrs. Gillis testified that she sent all the receipts she knew anything about to her attorney Mr. Schenk, in order for him to prepare the proof of death. Mr. Schenk testified that he had no personal knowledge of the facts, and prepared the proof of death, including Mrs. Gillis's affidavit, from the receipts which he had before him and information given him at the time. It was also shown that the receipts referred to were delivered to Mr. Schenk by the plaintiff A. W. Gillis, acting for his wife.

At the first trial A. W. Gillis testified, in substance, that he paid assessments 134 and 135 for his son at the same time and place; that the payment was made at the time stated in the receipt, November 1, 1906, and was made to O. D. White at a mill in the town of Morgan. The record indicates that at the first trial the case was decided against plaintiffs, and they admit that since that time, and at all subsequent trials, they have changed their testimony in material respects. At these, and especially at the last trial, Mr. Gillis testified that he did not make the payments referred to at the mill and did not make them on November 1st, but that he made both payments at the same time at Major's store in the town of Morgan, and on the 8th of October, 1906. He also testified that Mr. White gave him a receipt for $2.50, showing upon its face that it was for assessments 134 and 135, and that it was written upon a sheet of Major's bill-head paper. In other words, that the sheet of paper upon which the receipt was written had Major's name printed at the top. He testified upon the last trial that he took that receipt home and gave it to his wife, and that

afterwards, and down at the mill, Mr. White handed him a receipt made out on Maccabees printed forms for the same assessments, which receipt he accepted in lieu of the Major's bill-head receipt, and which was one of the four receipts furnished to Mr. Schenk to prepare the proof of death. He said that he showed the Major's bill-head receipt to his attorney Mr. Schenk, before the suit was brought; that he did not testify about it at the first trial because he was not asked anything about it; that after the first trial his wife found it at home and gave it to him, and he lost it so that it could not be produced at the second trial; that he afterwards found it, and then lost it again, so that it could not be produced at the third trial, and was not produced at the fourth and last trial. He testified specifically that it was dated October 8, 1906, was for the sum of $2.50, for assessments 134 and 135 against Furman A. Gillis, and was signed by O. D. White.

Mr. Schenk, the plaintiffs' attorney, testified at the last trial that he never saw the Major's bill-head receipt until after the first trial, when it was brought to him by Mr. Gillis, and that he gave it back to Mr. Gillis. Describing that instrument, he said: "I heard the testimony of Mrs. Gillis here this morning about the receipt appearing ragged. It was pretty ragged when I saw it. It looked like it had been folded into a very small fold; folded over and over and over, like we ordinarily carry a receipt or something in a pocketbook, folded into small folds so that it would go into a small pocketbook. It had creased or something had bent it so part of the writing and a part of the printing had almost been wiped out; in fact, some of it was gone. I don't know how much of the receipt I could read. I never charged my memory with that. I remember the name and the date. The amount, as I remember, I couldn't tell what the amount was. I might have guessed at it. I couldn't tell from the receipt what it was. It was dated the 8th of October, 1906. It was written on Major's letter paper. I just got a general idea of the receipt. I remember I couldn't tell what the amount of it was. I don't remember anything about the assessment numbers on it."

Mrs. Gillis gave testimony at the last trial corroborating that given by Mr. Gillis to the extent of saying that he brought the receipt home and gave it to her to keep; that she found it after the first trial and gave it to him, and he lost it, and she found it in one of his pockets and gave it to him again, and he lost it the second time. She said she did not read it until after the first trial, and stated that it was written on Major's billhead paper, was for assessments against her son Furman, and was signed by O. D. White, dated October 8, 1906; but she did not distinctly state that it had on it the numbers 134 and 135. Mr. Gillis, while admitting

that he swore at the first trial that he paid assessments 134 and 135 in November, 1906, testified at the last trial that he had refreshed his memory, and had ascertained that he was mistaken as to the time, and that in fact he made the payments referred to on October 8, 1906, and not at the mill, as he had stated at the first trial, but at Major's store. In one place in his testimony he denied that he had changed his evidence because of the result of the first trial and what had occurred during that trial. While on the witness stand he was asked this question: "Is it not a fact that the reason you have changed your testimony as to the time and place you paid O. D. White assessments 134 and 135 on November 1, 1906, and at or near the mill, to the date now testified to, to wit, the early part of October, 1906, was because that on the first trial that the jury on said trial brought in a verdict against you?" And he answered: "I won't say that it was. After refreshing my memory, I remember that I paid that money to him at the store instead of the mill. No, the verdict of the jury didn't have anything to do with my changing my testimony. I found out better after thinking and talking with my wife and White. It was at the store instead of at the mill. I guess I found I could not rely upon the receipts produced at the first trial."

An effort was made to corroborate Mr. Gillis's testimony as to the time the payment was made, and he and his wife and a Mrs. Belcher testified that on Sunday, the 7th of October, 1906, Mr. and Mrs. Gillis met Mrs. Belcher and her brother-in-law, O. D. White, on a public road near Morgan; that Mr. Gillis asked Mr. White if he would be in Morgan the next day, and he said he would, and Mr. Gillis told him that he would see him there and make him a payment on his son's insurance policy. The witnesses differ some as to exactly what was said; Mrs. Gillis saying that Mr. Gillis asked Mr. White if their son Furman was behind with his dues, or if he was paid up, and that Mr. White said he was paid up, that there was nothing behind at all, and that after some further conversation Mr. Gillis told him that he would meet him in town the next morning and pay him some money on Furman's dues. Mr. Gillis, after detailing the circumstance of meeting Mr. White and Mrs. Belcher on the occasion in question, said: "I told Mr. White I would be in Morgan on Monday morning following to pay him the dues for my son. As well as I remember, on the occasion above named I told Mr. White that I wanted to keep the boy's (Furman's) dues paid up. I told him I would be in Morgan the following day, which would be Monday morning, and pay them up. He said all right, and that he would be in Morgan."

Mr. White did not testify at the last trial, and Mrs. Belcher, after testifying to meeting with Mr. and Mrs. Gillis on the occasion in

question, said that Mr. Gillis and Mr. White had a conversation about paying some dues for Mr. Gillis's son. She said that Mr. and Mrs. Gillis both spoke up and told Mr. White that they wanted to pay their son's dues in the lodge. According to their testimony, Mr. and Mrs. Gillis then went on and spent the remainder of the day with Mr. Hooks and his family, and Mr. Gillis testified that he went to Morgan the next morning and paid the assessments referred to. He testified that he remembers that he made the payment the next day after meeting Mr. White, and having the conversation referred to and making the visit to Mr. Hooks. But neither he nor any other witness gave any satisfactory reason for knowing that that conversation occurred in the month of October, 1906. Mrs. Gillis and Mrs. Belcher both stated that it was before they started their children to school, but they did not give any reason why they could remember it was before and not after the children started to school. Mrs. Belcher said that she remembered the date of the meeting in the road and the conversation referred to because: "We had cotton on our wagon, and we did not have any surry, and Mr. White had to come after me in his surry. He came after me to spend the day at his house. Another reason is I remember that Mrs. Gillis had on the first new fall hat that I had seen that fall, and another reason is that was the first time I had met with Mrs. Gillis, and we had not started our children to school, and they were still picking cotton, and all of these things helped me to fix the date as about the first of October."

Mr. F. M. Hooks also testified for the plaintiffs, and stated that Mr. and Mrs. Gillis made a visit at his house on the first Sunday in October, 1906, and he said: "The reason I remember that it was on that particular date, I know at that time Mr. Gillis had out 17 bales of cotton and I only had out six bales. My cotton was late that year, and I know I was surprised to learn that he had out so much more than I did at the time. Since this controversy here about dates, I have had occasion to examine the gin books, and find that I was correct as to the date that they were at my house and spent the Sunday."

The witness did not explain what he found on the gin books that would show when Mr. and Mrs. Gillis made a visit to the witness and his family; and, in the absence of such an explanation, we do not think his testimony in reference to the gin books was of any probative force. His testimony as to how much cotton he and Mr. Gillis then had out is of no more value. If it had been shown when cotton picking commenced on Mr. Gillis's farm, how many hands he had at work, and about how long it would take them to get out 17 bales, that testimony might have tended to show when Mr. and Mrs. Gillis made the visit referred to.

As to the reasons assigned by Mrs. Gillis and Mrs. Belcher for remembering that date, they seem to be of no more force than those given by Mr. Hooks; and especially is this true as to Mrs. Belcher's statement about Mrs. Gillis having on the first new hat that she had seen. That event could have transpired on the first Sunday in November equally as well as the first Sunday in October. Mr. Gillis testified at the last trial that when he paid the money to Mr. White at Major's store on October 8, 1906, and White gave him the receipt written on Major's bill-head paper, White told him that he could not give him a regular Maccabees receipt, because Mr. Bell had been there and taken away all the Maccabees books and papers. Mr. Bell testified, and it was admitted by the plaintiffs, that he was there on November 27, 1906, and took away all of the Maccabees books and receipts. On October 8th White had in his possession the Maccabees books and papers, including the book of printed receipts, and therefore there could have been no occasion for his writing a receipt on the Major's bill-head paper; nor could he truthfully have said that Bell had taken away the Maccabees books and papers at that time. But if the payments referred to were made after November 27, 1906, as O. D. White's letter remitting the same tends to show, then White could very properly have told Mr. Gillis that Bell had carried away the Maccabees books and papers. But this is not all of the testimony tending to show that the payments referred to were not made at the time now claimed by Mr. Gillis. Assessment 135 was not levied until the 1st day of November, 1906, and it was not required to be paid until the 30th day of that month. Why should Mr. Gillis desire to pay an assessment before it had been levied? He testified that the payment referred to was the only one that he had ever made for his son, although he had stated to him that, if he needed funds to make the payments at any time, he would let him have them. There was other testimony tending to show that the payment referred to was not made in October, and we copy from appellant's supplemental brief the following summary of the testimony tending to support appellant's contention:

"(a) The admission Bell was there November 27, 1906, and took away the receipt books.

"(b) Gillis's testimony that White gave Major's bill-head receipt because Bell had been there and taken away the receipt books.

"(c) Gillis's testimony that White left him to go to the bank to get a draft to send the assessment away, the day he paid it, and informed him afterwards he had done so.

"(d) The draft and letter of White showing that date to be December 11, 1906.

"(e) The long delay in making proofs of death, which is inconsistent with the idea plaintiffs believed they had any claim against defendant at that time.

"(f) The affidavit of Mrs. Gillis in the proofs of death, showing payment December 1, 1906.

"(g) The testimony of Mrs. Gillis that she stated the facts in the proofs of death as to payment, as she understood them at the time.

"(h) The affidavit of O. D. White in the proofs of death, showing payment November 1, 1906.

"(i) The mutilated receipt 'Exhibit M,' showing payment of assessments 134 and 135 November 1, 1906, which has been shown to have been issued long after Bell was there and took away the receipt books.

"(j) The testimony of Gillis, on the first trial, that he paid assessments 134 and 135 at the time he got the receipt 'Exhibit M.'

"(k) The testimony of Mrs. Gillis on the first trial that the four printed receipts on Maccabee blanks were the only ones she had any knowledge of up to that time.

"(l) The testimony of Mr. Gillis that the time he paid assessments 134 and 135 was about a month after his boy was confined to the house, and that the boy was not confined to the house until about the middle of November, 1906.

"(m) The testimony of Mrs. Gillis that when Gillis brought that receipt to her she did not look at it, but put it away with the receipts, and she did not know what was on it until it was subsequently found after the first trial and taken to Schenk.

"(n) The testimony of Mr. Schenk that he never heard of the Major bill-head receipt until after the first trial, and it was then so mutilated and defaced that he could not tell either the amount or the numbers of the assessments on it.

"(o) The testimony of Mr. Gillis that his memory is so bad that he does not know whether he was sworn on the first trial of the case or not, and all the way through, one piece of his testimony disproves another, confirmed by the testimony of Mrs. Gillis that he had paralysis of the brain and his memory is bad."

The record indicates that there are but two persons who could know when assessments 134 and 135 were paid, and these are Mr. Gillis and O. D. White. For some reason, not explained, White did not testify at the last trial, and the plaintiffs rested their case upon Mr. Gillis's testimony alone as to the date of the payment referred to. The record shows that the testimony he gave at the last trial, to the effect that the payment was made on October 8, 1906, was contradicted, not only by his own testimony on the first trial and by the affidavits of Mrs. Gillis and O. D. White in the proof of death,

but by many other facts and circumstances tending to show that the payment referred to was not made during the month of October; and, such being the case, we feel compelled to hold that the verdict is not supported by satisfactory evidence, and must therefore be set aside.

Reversed and remanded.