TEXAS & P. RY. CO. v. LUCAS.  (No. 7674.)

(Court of Civil Appeals of Texas. Dallas. Dec. 23, 1916.)

1. SALES ⊗═52(5) — PURCHASE OF GOODS — CONTRACT — AGENCY — EVIDENCE — SUFFICIENCY.

In an action against a railroad to recover for groceries and supplies furnished by the plaintiff to the defendant's section hands and laborers pursuant to an alleged agreement with defendant's foreman that defendant would be responsible for the amount of bills incurred by said laborers, evidence *held* insufficient to show either an express or implied contract on the part of defendant to pay for the goods or to show that any agent of the defendant acting within the scope, or within the apparent scope of his authority who bought the goods or authorized their sale and delivery to support a judgment for the plaintiff.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 136, 137, 139; Dec. Dig. ⊗═52(5).]

2. SALES ⊗═52(2)—PURCHASE OF GOODS—EVIDENCE—BURDEN OF PROOF.

In an action against a railroad to recover for groceries furnished defendant's section hands and laborers pursuant to an alleged agreement with defendant's section foreman that defendant would be responsible for the goods, the burden of proof was upon the plaintiff to show his right to recover.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 124, 125, 127, 128; Dec. Dig. ⊗═52(2).]

Appeal from Dallas County Court; T. A. Work, Judge.

Suit by H. J. Lucas against the Texas & Pacific Railway Company. From a judgment of the county court for plaintiff on appeal and from a judgment of the justice court for plaintiff, defendant appeals. Reversed and rendered.

George Thompson, Flippen, Gresham & Freeman and Walter G. Miller, all of Dallas, for appellant. C. M. Means and W. M. Pierson, both of Dallas, and L. P. Pierson, of Winnsboro, for appellee.

TALBOT, J. This suit was instituted in the justice court of Dallas county, Tex., by the appellee, H. J. Lucas, by petition filed on August 30, 1913, to recover of the appellant the sum of $185.20, which appellee alleged was for groceries and supplies furnished by the appellee, Lucas, to section hands and laborers working on the railway company's tracks and right of way during the months of January, February, and March, 1913. Appellee, Lucas, alleges that T. C. Archer, the section foreman of the railway company, contracted and agreed with appellee that the appellant railway company would pay appellee and hold him whole and harmless for the amount of bills incurred by said laborers, not to exceed 75 cents a day for each laborer; that said goods sued for were sold on the faith and credit of defendant; that said persons were and are transient and mostly Mexicans; and that it was very necessary to defendant's business that said employés, or similar employés, be retained in its service, they being trackworkers, "transient, shiftless," and without funds to pay their usual and necessary living expenses. The railway company plead a general demurrer, a general denial, and specially denied the authority of the section foreman, Archer, to purchase groceries or supplies from the plaintiff Lucas and charge same to appellant, alleging that, if Archer made representations to the plaintiff that the defendant railway company would pay for merchandise and supplies purchased from appellee, in so doing he was not acting within the scope or apparent scope of his authority; further, that it had no notice of such representations or transactions between Archer and the appellee. Upon trial in the justice court judgment was rendered against appellant for amount sued for, and the defendant railway company perfected an appeal to the county court of Dallas county at law, Dallas county, Tex. Upon trial in the county court of Dallas county, at law, the case was submitted to the jury upon special issues, and on the findings of the jury in that court judgment was rendered in favor of appellee against appellant for the sum of $207.42, which included interest, from which judgment this appeal is prosecuted.

The first assignment of error complains of the trial court's refusal to give a special charge requested by appellant, directing the jury to return a verdict in its favor, appellant's contention being that the evidence adduced was insufficient to show that it was liable in any manner for the claim sued on; that if the evidence shows that appellant's section foreman, Archer, contracted and agreed with the appellee, Lucas, that appellant would pay him for goods sold and delivered to its section hands, it fails to show that Archer in making such contract was acting within the scope, or apparent scope, of his authority as appellant's agent. This is the controlling question arising on the appeal, and the strongest testimony found in the record in support of the ruling here complained of is that of the appellee himself, which can be better understood by setting it out practically in full. Appellee testified:

"I am the plaintiff in this suit, and am suing the Texas & Pacific Railway Company for $185.20, same being for supplies which were furnished by me during the months of January, February, and March, 1913, while I was engaged in the grocery business at Grand Prairie. I know T. C. Archer, who was section foreman at that time for the T. & P. Railway Company. He had men working for him who were mostly negroes and Mexicans, who were mostly classed as transient people. I did not credit Mr. Archer or the Mexicans working under him individually, but I credited the Texas & Pacific Railway Company. These people were working for the Texas & Pacific Railway Company. These supplies consisted of eatables—different kinds of groceries. I have an itemized statement of these supplies which were sold and delivered by me, and same is true and correct. I did not keep

any books; I just had the McCasky system. This system is where you take an order and it makes a duplicate form, and you give the customer a duplicate and keep the original yourself and bring the amount forward, and you keep all the tickets with the amount forwarded, and your last bill always shows the whole grand total. The statements which I have here are the originals. These originals represent the accounts, and I have not received payment for any of this $185.20 for which I am suing, and which amount is still due and unpaid. There are not any lawful offsets to it or payments or credits. These tickets showing the items of supplies furnished and the cost of same are made out to Archer or headed to Archer, by such and such an individual, and that is turned into Archer each pay day. These slips are made out to Archer as a matter of form. Sometimes I just keep it under the name of each individual Mexican or laborer. I have been out at Grand Prairie about eight years. I was raised near there. I had been there about five years at the time this account arose, and during all of such time I was engaged in business at Grand Prairie. During such time I knew that the Texas & Pacific Railway Company had its general offices in Dallas. I also knew that it had a paymaster. I saw the pay car come to Grand Prairie each month. I also then knew that Mr. Archer, the section foreman, was working under a higher officer. I then knew that there was a roadmaster over each division and who were over the section foreman. I never spoke to Mr. Everman, the general superintendent of the Texas & Pacific at Dallas, as to whether or not the Texas & Pacific would pay for these groceries. I never had any conversation about it with anybody except Archer or some other section foreman who was there. Just the section foremen are the only ones I had anything to do with. All of these tickets are made out to Archer with the date, showing the Mexican or particular laborer who got the merchandise, with the amount brought forward on each ticket. None of the tickets are made out to the Texas & Pacific Railway Company. I never did make out and mail to the officers of the Texas & Pacific any bill or ticket for any of these supplies or for any other supplies at any time. I merely gave the tickets to the section foreman and he paid me. The section foreman always paid me, with the exception of this time, and the amount for which I am now suing. The section foreman always called upon the 1st of the month, I think it was, and I give him all the claims I had. They gave me the privilege of extending 75 cents a day credit, and no more. I took the precaution not to go over that. On the 1st they called for these bills, and I suppose they turned them in with the board bills, but I don't know. These bills are for January, February, and March, 1913, and are for groceries furnished Mexicans during those months. On February 1st Archer, the section foreman, I think, paid part of the amount due for January. I think he gave me $59 at that time. I don't remember how much balance that left due for January. Archer at that time claimed that the full amount of the board bill had not been allowed at the general office. He did not pay on March 1st the balance due for January and for the month of February; he running away some time in March, I believe. There were two months that he failed to pay up like he had before. When he fell behind and failed to pay I did not write or say anything to the paymaster or write to the Texas & Pacific at Dallas. I trusted the section foreman and believed what he said, and thought he would come up all right. In a way I accepted what he said, but I investigated it the best I could through our ticket agent, Mr. G. M. Doyle. Anyhow, all the information I had was what the section foreman gave me and those whom I had

dealings with. I turned the statements over to them and they paid me the amount of the bills. There was no section house at Grand Prairie. At that time the Texas & Pacific had built a siding and put some box cars out there and had some tents, and these Mexicans slept and cooked there, and I think one of the section foremen lived at Eagle Ford for a long time. That section foreman's name was Columbus Moore. They did not get all their groceries from me all the time, but quite frequently they did. I have been a resident of Grand Prairie about eight years, and during such time the Texas & Pacific section foreman did not trade with me regularly all the time. Maybe they trade six or eight months during the year with me, and then switch off, and then they get some things from the general supply house the company has. I suppose they have dealt with me in this manner during at least half of the time, or more than half the time. During all of that time I never turned in any bill to any official of the railroad at Dallas, nor to the roadmaster. I always turned in my bills to the section foreman. The section foreman told me that my bills were turned in to the general office as board bills of the Texas & Pacific which he collected and paid me. This must have gone on something over four years. I never received any notice from the Texas & Pacific or any of its agents or employés that they objected to this course of dealing. I never communicated with any of the officers or employés about it, except the section foreman. Some of these Mexicans or laborers who were working under Archer when he skipped out, and who should have been paid by Archer, but were not, were later paid by the company. These supplies were furnished for the Texas & Pacific. These men who got the supplies were working for the Texas & Pacific. I knew the Texas & Pacific agent at Grand Prairie. He knew of my course of dealing with the section foremen with reference to furnishing supplies. He never raised any objection to it. I never heard of any objections being raised in the course of my dealings until this particular case came up. I understood that Archer went off with a lot of money on the pay roll. I did not know anything about Archer's, the section foreman's, dealings with the head office. I did not know that on the first of March the Texas & Pacific paid Archer $265 for board alone. I did not know that for the month of January the Texas & Pacific paid Mr. Archer something like $150 or more for board for men working under him. I did not know what Archer got. During such time I knew that the Texas & Pacific had a supply house at Marshall, but I don't know about Ft. Worth. I have heard the laborers or the section foreman working for the Texas & Pacific say that the Texas & Pacific had a supply house where they could present orders and get groceries. During such time I knew that they sometimes got supplies from Marshall. The railway company worked these men on the section that I furnished these groceries to. I did not know of any secret limitation on the authority of the section foreman to purchase these groceries for the Texas & Pacific. I did not inquire of any of the Texas & Pacific officials as to whether or not there were any restrictions upon Archer's authority. The Texas & Pacific Railway Company did not make any objections to me as to my course of dealing with Archer, or with any of the other section foremen with whom I had had dealings. I never had any instructions or communication or any advice or any objections from any of the Texas & Pacific officials."

The practically undisputed testimony offered by the appellant is to the effect that during the months the goods involved in this suit were purchased from appellee upon the

alleged contract made with the section foreman Archer, and for a long time prior thereto appellant had supply houses located in each division of its road and an agreement with them to furnish service supplies to its section foremen, and from which houses such supplies could be obtained by its section foremen, both for themselves and the section men working under them; that appellant had an arrangement with its section foremen, including the said T. C. Archer, whereby they could board section men and get board deduction orders from them, properly signed, and send them in with his time book, and the amounts, if correct, would be deducted on the pay rolls from the time of the men, in the foreman's favor, but that neither Section Foreman Archer, nor any other section foreman working for it, had ever been permitted at any time to buy goods of any character from appellee or any other merchant of Grand Prairie to be charged to or paid for by the appellant; that Foreman Archer worked in H. M. Levinson's division and under his control and subject to his orders and instructions, and that Levinson did not give Archer authority to contract bills for himself or for any of his laborers with the appellee at Grand Prairie or anywhere else; that Levinson never gave Section Foreman Archer, or any other section foreman working for appellant prior to him at Grand Prairie, authority to buy supplies for himself, or laborers under him, to be paid for by the appellant, and that he (Levinson) never made any contract with the appellee, Lucas, or any other merchant at Grand Prairie, to pay for goods and merchandise supplied Archer or laborers working under him, and that he did not know of any one else who had for the appellant done so; that Foreman Archer had the privilege of boarding the laborers working under him, but that no statements or bills for goods, groceries, or supplies furnished Archer or his laborers were received by the appellant.

[1] Obviously this testimony is insufficient to support the judgment of the lower court. It fails to show either an express or implied contract on the part of appellant to pay for the goods sued for by the appellee. It fails to show that any agent of the appellant acting within the scope or apparent scope of his authority bought the goods or authorized the sale and delivery of them to the parties to whom appellee claims they were sold and delivered. Its lack of sufficient probative force to show liability on the part of appellant for the payment of the amount charged therefor is apparent. The phrase "any evidence" does not mean the slightest scintilla of evidence, but such as from which a jury might reasonably infer the existence of the alleged fact. In Hyatt v. Johnston, 91 Pa. 200, cited with approval in Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059, it is said:

"Since the scintilla doctrine has been exploded, both in England and in this country, the preliminary question of law for the court is not whether there is literally no evidence, or a mere scintilla, but whether there is any that ought reasonably to satisfy the jury that the fact sought to be proved is established. If there is evidence from which the jury can properly find the question for the party on whom the burden of proof rests, it should be submitted; if not, it should be withdrawn from the jury."

[2] The burden of proof was upon the appellee to show his right to recover, and since, in our opinion, there was no evidence adduced from which the jury could properly conclude that this burden had been discharged, we hold the peremptory instruction asked by the appellant should have been given.

From this it follows that judgment should have been rendered in the court below in favor of the appellant, and that it becomes our duty under the statute to render such judgment in this court.

It is therefore ordered that the judgment of the court below be reversed, and that judgment be here rendered in favor of the appellant.