### SCHAFF v. VERBLE. (No. 6699.) *

(Court of Civil Appeals of Texas. San Antonio. March 15, 1922. Rehearing Denied April 12, 1922.)

1. **Railroads ⚓348(1)—Verdict for motorcyclist injured at crossing held contrary to evidence.**

In an action for injuries to a motorcyclist at a railroad crossing where the deposition of the motorcyclist as to the absence of the flagman at the crossing and as to the manner the accident occurred was unsupported by any evidence and was contradicted by the testimony, not only of the railroad employés, but of disinterested witnesses, including an automobile driver who had been stopped at the crossing by the flagman before plaintiff reached there, a verdict finding for plaintiff on all special issues submitted was clearly against the preponderance of the evidence.

2. **Jury ⚓37—Regardless of right to jury trial, verdict in disregard of positive testimony of unimpeached witnesses will not be sustained.**

The right of trial by jury does not require the courts to uphold verdicts manifestly in disregard of the positive testimony of unimpeached witnesses or of natural laws, notwithstanding testimony of a party in support thereof.

3. **Appeal and error ⚓1005(4) — Approved verdict clearly wrong will not be sustained.**

Though the responsibility of setting aside a verdict which is so against the preponderance of the evidence as to be clearly wrong specially rests in the trial courts which see and hear the witnesses, and their failure to grant new trials is persuasive, the appellate courts also must be satisfied from the record before giving the verdict their approval.

#### On Motion for Rehearing.

4. **Railroads ⚓338—Contributory negligence no defense to negligence after discovered peril.**

The negligent failure of an engineer to use every means to avoid the accident after discovering plaintiff's peril is such reckless indifference as to be subject to the same civil consequences as for a willful or wanton act, so that the contributory negligence of the person injured is no defense thereto.

5. **Railroads ⚓320—Engineer can assume motorcyclist approaching crossing guarded by flagman will stop.**

The failure of an engineer to stop his engine immediately on discovering the approach of a motorcyclist to a street crossing at which a flagman was on duty and exhibiting a sign directing vehicles to stop was not negligence after discovering the motorcyclist's peril, since the engineer had a right to assume that the motorcyclist would stop before reaching the crossing.

Appeal from District Court, Bexar County; R. B. Minor, Judge.

Action by C. A. Verble against C. E. Schaff, as receiver of the Missouri, Kansas & Texas Railway Company of Texas, to recover damages for personal injuries. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

C. C. Huff, of Dallas, and F. C. Davis and W. B. Teagarden, both of San Antonio, for plaintiff in error.

Ben H. Kelly, of San Antonio, for defendant in error.

COBBS, J. Appellee filed this suit against appellant, the receiver of the Missouri, Kansas & Texas Railway Company of Texas, for personal injuries, the result of a collision between a motorcycle he was riding and a railroad engine operated on a street crossing in the city of San Antonio, which appellee alleges was caused by the negligence of appellant, in that the flagman failed to display or give proper signal warning of the approach of the engine in time, and the engineer and fireman in charge of the engine failed to give warning of its approach by whistle or bell and failed to stop the same after seeing plaintiff and discovering his danger in time to avoid the accident; that, if his presence and danger was not actually

discovered in time to have avoided the accident, the engineer and fireman, by the exercise of ordinary care, could have discovered the danger in time to have avoided the injury.

Appellant replied by general denial and special answer charging that the accident and injuries complained of were due wholly and entirely to the negligence of appellee which contributed to bringing about the accident and injuries.

The case was tried with a jury upon special issues submitted by the court and every one of which was found in favor of appellee and against appellant, upon which the court rendered judgment against appellant in favor of appellee for $6,000.

The first, second, and third assignments complain of the refusal of the court at appellant's request to instruct a verdict for it, and refusal to set aside the verdict and grant a new trial.

Relegating the discussion of the assignments and propositions in detail, the important question here is whether the appellee has established a case of liability as a matter of law. This of course, is looking at it from the standpoint of the facts introduced. The only direct testimony offered to the accident is by the appellant himself. His statement is supported by no other witness as to the accident, but, on the contrary, is contradicted by the overwhelming preponderance of testimony of all the other witnesses who witnessed the collision.

The testimony of appellee was by deposition taken in the city of Waco.

At the time of the injury, appellee was a dispatch rider for the United States government, stationed at Camp Normoyle, delivering dispatches from various military camps and offices in and near San Antonio; had been engaged in that work for about eight months; was injured in a collision with an engine or train of the Missouri, Kansas & Texas Railway Company, at crossing on Nogalitos street in city of San Antonio. His right arm was broken in two places between wrist and elbow, bruises on his arm and left knee, and three of his fingers on his left hand injured requiring the amputation of the index finger between first joint and knuckle.

He states at the time of the accident he was going in a southeasterly direction, riding a Harley-Davidson motorcycle belonging to the government, at a speed of 15 miles per hour, and the engine was moving southeast at the time at about the same rate of speed; that he had been along over said Nogalitos street over said railroad crossing many times during the preceding six months at an average of four or more times each day.

The street at the point of accident was about 40 feet from curb to curb. The railroad crosses the street practically at right angles in a general direction from southeast to northwest, while Nogalitos street runs in a general direction northeast to southwest.

He stated he could not remember how many houses are on either side of the street near the accident, but knows there are several obstructions, consisting of either houses, trees, signboards, or other obstructions of sufficient height to make it impossible to see either to the right or left of said railroad track from said street until you are practically on the right of way itself, close to the right of way itself. He says:

"I have made what I think is an accurate plat of the scene of the accident, showing the street and right of way including the double car tracks, the flagman's station, scene of obstruction on either side."

This map is made with such clearness of lines and in such perfect detail of measurement, one would wonder how the witness, claimed to be a laborer—working man—so badly crippled, could do such splendid platting with such skill and accuracy. He does not profess to attach it as the work of another or attach it after identification as a part of his testimony, but says, "I have made what I think is an accurate plat." Well, be it so. After all, it shows Nogalitos street to be a very plain broad street with the broad right of way of the railroad crossing, including the flag station of the flagman. He said he always saw the flagman of the defendant at said crossing giving signs suspended to a short pole or stick "containing large letters. the word, 'Stop.'" Usually standing in the street on or near the car tracks, giving the sign as a stop signal for people passing on said street. "Have seen him there every time I had passed for the past six or more months, from four to eight times a day."

He said:

"The day of accident, I approached the crossing, and, when a block or more away, I slowed down my motorcycle some, in anticipation of danger at said crossing, and could not and did not see the flagman until I had gotten about 30 feet from the Katy track. I was on the right of the road going southwest, and he came running from his flag station towards me and waving it as he ran towards me. I then discovered the engine approaching backwards from northwest, going southeast. It was about as far off and going about as fast as I was, and I do not think I saw him either before or after the accident. * * * I saw him run from his station and wave his flag as I was about 30 feet from crossing, and was then unable to stop or clear ahead of the engine. My motorcycle could not be stopped short of about 100 feet, and I was then much less than that from the track. * * * I did slow up when a block or more away, and not only looked for the flagman, but also for other evidences of a train or engine or danger. Having seen neither, I increased my speed perhaps a little, thinking the street was open and that there was no danger. Immediately, when seeing the signal, as already stated, I hurriedly applied the brake,.

put my motorcycle in low gear, and throwed my machine, trying to turn it around so as to escape injury and danger, but was unsuccessful, as did not have enough time to do so; it was impossible to stop my motorcycle sooner, or for me to prevent the accident after I discovered the danger or peril; I don't think I was over 30 feet distant when I first discovered the engine and the danger. * * * I was, and am, a farmer or a day laborer, not capable of doing other work; that is what I expected to do when discharged, and have been trying to do it since."

F. A. Brown testified he was the flagman whose duty it was to give the signals to stop or go on. At time of the accident, he was standing in the middle of the street on the north side of the Katy track, holding up the stop signal, and had been there displaying his signal for five minutes or more. Had stopped a man, the witness Graham, in an automobile, as he was coming. He came up near the Katy track and stopped, waiting for the engine to pass, before the accident, and was waiting before the engine came onto the street. After the tender and back of the engine got out in the street, appellee came up behind him at a speed described to be 35 or 40 miles an hour, and when witness saw appellee he was within 40 feet from witness. Appellee had commenced circling, and witness had to run to get out of his way. Appellee circled and hit the engine tender, but for that would have hit the driving wheels of the engine. After appellee struck the tank, the engine went about 15 or 20 feet before it stopped, which was a quick stop. The engine was backing over the crossing, the engineer on the north side and the fireman on the other side. A person approaching this crossing from the north could have seen the engine coming from towards the Katy depot 150 yards from the crossing. There is no obstruction to prevent a person, coming as appellee was to the crossing, from seeing a train coming as this one was, for 100 to 150 yards on Nogalitos street, at least 50 yards. Witness stated he saw appellee up the street, coming to the crossing, was the reason he was holding up and waving the signal for all people on both sides to "stop." Could see appellee further than the man in the automobile because it was level on that side, but, on the other (automobile) side, a rise coming up. The engine was going 4 or 5 miles an hour, and the bell was ringing.

S. Gresham testified he was present and saw the accident, had been and then was in the United States government service for three years, familiar with the crossing, which he had passed daily during that period. Was on his way to the city. As he was crossing the S. P. tracks on Nogalitos street, saw a switch engine backing out toward the street from the west going east rather slow. Saw the crossing watchman out in the center of Nogalitos street on the north side of the Katy track holding a stop sign above his head. The switch engine backed east on the Katy tracks, and drove up to the south side of the Katy tracks and stopped. He saw a motorcycle coming out on Nogalitos street from the opposite direction. First saw it while he was driving up to the Katy tracks before he stopped to let the engine go by. The witness was just passing the S. P. track when he first saw appellee coming down the street. "He came on pretty fast," and did not seem to notice the watchman out in the center of the street with his stop sign, nor seem to notice the switch engine backing out into Nogalitos street. It did not seem that he slackened his speed or made any effort to do so until he was right close up to the switch engine, seemed then to try to stop, but, failing, turned to the left to avoid the accident, when his motorcycle slipped from under him, and both slid right into the middle of the track right under the tank about the middle of the street. The switch engine was going at rather a slow speed. Appellee was then taken from under the tank, and put in the car of witness who took him to the base hospital. There was no vehicle in sight, no obstruction of any sort between the man on the motorcycle and the watchman in the center of the street. The flagman was not in his house. He was out in the street waving his signal and could have been seen for two blocks.

Mrs. L. Broussard, a witness for defendant, resided on Cassiano street, San Antonio. She was familiar with the place of the accident and was present and witnessed it when she was walking in the direction where the accident occurred about a half block from the Katy crossing. She saw Flagman Brown out in the center of the street standing there with his stop sign, and the tender just coming into Nogalitos street; was in about 20 feet from the crossing when she heard the crash. The switch engine, she said, was going slow, just creeping along, walking speed for her. The flagman was in the center of the street with his stop sign up. The bell was ringing when the tender and the engine came into Nogalitos street. She did not see the appellee because the engine was between them as she was walking towards the crossing.

C. W. Powell, engineer on the engine in question, testified for defendant, in substance, that he was operating the engine at the time of the accident. Just prior to, and at the time of, the accident, he was going at the rate of about 5 miles an hour. The flagman was out, and had his signboards out towards the street, and he (witness) had the right of way. Before he got to the street, he could see the flagman about 200 yards. The flagman had been out there from the time witness started to the crossing, or for that distance. The sign was adjusted with the edge to witness, showing that he had the

right of way, and this meant that he should go across, and signified to the public to stop. Before he discovered anything unusual, he thinks the tender was about 15 or 20 feet across the street; the bell was ringing all the time continuously, and witness was looking right at the crossing all the time, and saw the flagman there all the time. When he first saw the plaintiff, he thinks he was about 20 or 30 feet north of the flagman when witness first discovered him. As to plaintiff's speed, he says:

"He was undoubtedly making 30 or 35 miles an hour when I first discovered him. * * * When he got right close up to the track, why he turned, you know, or kind of turned down the track, some way. I was very busy at the time, I saw that there was going to be an accident, and I turned around just as quickly as I could, you know, to get hold of my break valve and release. I threw the engine in the forward movement to make a quick stop, which I did make—a quick stop. I stopped in about 12 or 15 feet, anyway."

When the motorcycle went to turn, the flagman jumped out of the road to keep from getting run over. The fireman was on the other side of the engine; he was ringing the bell all the time. It was but a few seconds from the time he first saw plaintiff until he turned; "he was pretty near right on the flagman before the flagman got out of the way." He first saw the plaintiff 40 or 45 feet before he got to the flagman. Witness did not stop right immediately (when he first saw plaintiff), did not reverse the engine, or blow the whistle then, because he saw the sign up there, and presumed plaintiff was going to stop, because the rules require him to stop. He could have stopped the engine in 12 or 15 feet by using the appliances at hand, and did stop in 12 or 15 feet, as soon as he saw plaintiff begin to circle. Again he says: "I certainly was expecting him to stop."

Among other things, upon cross-examination, he testified:

"I saw him 40 or 45 feet before he got to the flagman. He was not very far from the track before he began that circling, not as far as 20 or 30 feet. I couldn't say just how far I was from Nogalitos street when I first saw him. I wasn't as far off from the Katy crossing as he was. I didn't stop right immediately. I did not reverse my engine, and I did not blow my whistle then, because I saw the sign up there. I presumed he was going to stop because the rules require him to, and give me that open track; and that was why I kept going on, because I knew I had the right to that road. Could have stopped before I ever got that tender to the street; had I used the means at my hands, I could have stopped that engine in 12 or 15 feet; I could have stopped before I got to that street. But I did not have time to stop; I had the right of way, and I did not stop because the flagman was giving me the

right of way, and I expected to use that right of way, because I had the right to it. My engine was under good control. It was well equipped with brakes and air, and going at the rate, not to exceed 5 miles an hour. I could have stopped in 15 or 20 feet."

J. C. Tegler, a switchman with the engine, testified, in substance, that he was present and witnessed the accident. He was at the switch stand west of and near to Nogalitos street, to protect a belated train, and was watching that train. He first saw plaintiff at about 75 feet from the railroad track. The next he saw of him was when he swerved his machine around. It was done in a flash, turning his machine and falling. He hit the tank of the engine and fell under it. The next he saw of him was after he was up and out from under the tank. As to plaintiff's speed as he approached the crossing, the witness says: "To the best of my judgment, he was going 45 miles an hour." The tender was stopped west of the in-bound car track in the street. When he first saw plaintiff approaching the crossing, he did not apparently seem to notice the engine or the flagman either until he got up pretty close, and to where he made the turn this was apparently the only time he saw the engine or the flagman. "As to how far I saw him go before he appeared to notice and make that turn, it was done in such a flash, that I—it was done in (snapping fingers) a flash, that I could not tell what the distance was from the time I saw him until he made this turn, made the turn toward the flagman, and the flagman had to run to get out of his way." Witness saw him before he turned. It was not more than a second before he turned, and plaintiff was then about 70 feet from the car tracks, and 30 or 40 feet from where the flagman stood. He did not begin to turn until he got to where the flagman was.

C. G. Schwartz, fireman on the engine at the time of the accident, testified, in substance, that he was on the engine. In approaching the street on the occasion in question, that the engine at the time was moving at about 5 miles per hour, and the bell was ringing, and had been ringing from the time they started 300 or 400 feet distant. He was on the south side. He saw the automobile approach from the south. It drove up and stopped at the crossing. He never did see the motorcycle; he was on the opposite side of the engine. His attention was first called to the incident by seeing the engineer make a movement to stop very quickly, after which they went 12 or 15 feet and stopped. The engineer made a good stop. The east end of the tender lacked 4 or 5 feet of reaching the curb on the east side of the street. Witness was watching on his side, and ringing the bell, and did not see the accident. It is the duty of the fireman

to watch on his side; he does not watch on both sides; this would be impossible.

No other testimony was offered by appellee who saw the accident than appellee's. He used four other witnesses, one, Mr. W. W. Boone, a lawyer, who made measurements of the ground, Henry Hunt and T. E. Wood as to the value of services, or rather the measure of damages, and E. M. Sward, captain medical corps, United States Army, as to injuries.

[1] Notwithstanding that the only direct testimony offered to establish the case was the appellee, himself, whose testimony was taken by deposition, and is emphatically contradicted by all the witnesses, as well as by the physical facts, and notwithstanding the court charged "the burden rests upon the plaintiff to show by a preponderance of the evidence the affirmative of such issues," the jury entirely disregarded the testimony and refused to follow the instructions of the court, and found every issue and every fact against appellant, and the court permitted that judgment to stand. It could only be arrived at by the jury by the wholesale disregard and refusal to believe or credit the testimony of a single disinterested witness to the contrary. Such wholesale disregard of testimony and the instruction of the court as to the preponderance of the testimony should not be tolerated in a court of justice and law. They were told they were "the exclusive judges of the credibility of the witnesses and the weight to be given to their testimony," and there is no circumstance in this case that throws doubt upon the "credibility" of a single witness who testified for appellant. They did not have the appellee before them. He was not there to be subject to and pass through a grilling cross-examination where the court and the jury might have seen his manner while testifying, so that his "credibility" might be properly weighed.

The appellee passed this crossing three or four times a day; was most familiar with the ground and obstructions, if any. Had daily seen the flagman giving the signs. As motorcycles are used by traffic officers, it may be supposed they are the fastest vehicles on wheels. Bearing in mind that a railroad can only travel on its own street and right of way, it cannot turn out of danger like a motorcycle under control and carefully handled. If, as stated by some of the witnesses, he was going 30 miles an hour, he covered the distance between the position where he says he was when he saw the flagman start to run from his shanty and the track less than a second, and the last hundred yards as he approached the crossing at something over 6½ seconds, and the last hundred feet in a fraction of over 2 seconds. At the rate of speed given by him of 15 miles an hour, he covered the last hundred yards in over 13 seconds and the last 150 feet in

6½ seconds, and the last 75 feet, which was before the engineer discovered him, in 3¼ seconds. Taking appellee's rate of speed and distances, and that he never saw the flagman until the flagman started to run from the shanty, he must have been at least 150 feet from place of collision. At 15 miles an hour, this distance was covered in 6½ seconds. It, in fact, would be less time than would be required for the flagman to reach the position when appellee ran into the tank. A signal at 100 feet would have been sufficient warning to appellee, running down plainly a broad paved street, for the collision to have been prevented, because he testified he could have stopped his machine within 100 feet. While appellee said he slowed down a little to look, it does not seem to have diminished the mad speed such as the switchman said "all done in a flash," which caused the flagman to run to get out of the way, which the witness Gresham said, saw him two blocks away, "going at a pretty nice little speed," and as he saw him first coming down the street, "he came on pretty fast," and again described as a "pretty rapid rate of speed."

[2, 3] The physical facts and all the testimony contradict appellee upon every material issue. However sacred the right of trial by jury is supposed to be, and is, it is not meant that the courts shall uphold them in verdicts manifestly in disregard of positive testimony of unimpeached witnesses. Ry Co. v. Syfan (Tex. Civ. App.) 43 S. W. 553; Ry. Co. v. Loeffler (Tex. Civ. App.) 59 S. W. 562; Ry. v. Jones (Tex. Civ. App.) 233 S. W. 369. The courts will not shut their eyes nor close their ears to the natural laws or the laws of physics so that the every utterance of a witness shall be taken as testimony of probative value of its utterance. The appellate courts will hear, investigate, and look into the facts of every case cautiously and independently for itself with the view of finding out the right, within the legal rules prescribed for its determination, which neither requires nor contemplates that the mind and the conscience of the court shall be entirely and unreservedly surrendered to the judgment of a jury upon all questions of fact that may arise in the trial of a case. "When that verdict is against the weight and preponderance of the evidence as to be clearly wrong. it is the duty of the court to set such verdict aside; and the grave responsibility is placed upon the judiciary of determining whether or not the evidence in a particular case is legally sufficient to deprive a citizen of his property, which cannot be evaded." This responsibility specially rests on the trial courts in the first instance, for they are in close touch with the juries and see and hear the witnesses, observing their appearance, interest, and manner of testifying. But while the failure of the trial courts to grant new trials is persuasive, and judgments

should be affirmed if possible, the appellate courts, too, must be satisfied from the record before giving such its approval. So judgments supported alone by the uncorroborated testimony of a plaintiff were, in Mo. P. Ry. Co. v. Somers, 78 Tex. 439, 14 S. W. 779, twice reversed. Dimmitt v. Robbins, 74 Tex. 441, 12 S. W. 94; Ry. v. Walker, 38 Tex. Civ. App. 76, 85 S. W. 28; Knights of Maccabees v. Gillis (Tex. Civ. App.) 144 S. W. 713. Both of the last-named cases were decided by this court. Hines v. Roan (Tex. Civ. App.) 230 S. W. 1082; Ry. Co. v. Schmidt, 61 Tex. 285; Ry. Co. v. Lucas (Tex. Civ. App.) 190 S. W. 800; Lans v. Bristow (Tex. Civ. App.) 188 S. W. 970.

Much has been said in the oral argument and printed brief in criticism of the engineer's testimony. Now, according to appellee's witness Boone, the engineer could not have seen appellee but 75 feet off. The engineer did not see appellee until he was less than 50 feet of the track, only a matter of a few seconds. He says he expected the appellee to stop. He was moving across the street where appellee could see; the bell was ringing; the flagman was at his post with stop signal exposed there some time; street was clear; man in automobile obeyed the flagman's stop signal and stopped. Everybody about crossing took notice and stopped. This same flag was as much for the direction and safety of appellee as it was for the train and crew and the automobile man, who obeyed it, and everyone else. It was as well the duty of the appellee as any one traveling that road to reasonably stop, look, and listen before crossing the track— look for the stop flag, approaching trains, and listen for the signals of the train, such as blowing the whistle and ringing of bells. Ry. v. Garcia, 75 Tex. 591, 13 S. W. 223. The appellee never stopped; appellant did as soon as he discovered appellee was not going to, released the air and reversed the engine within 12 to 15 feet. How great is the contrast! If, as appellee says, he was only going 15 miles per hour when within 30 feet of the track he saw the flagman, and this enormous engine stopped within 15 feet, could not appellee have stopped within the same distance after he saw his danger, if he had his machine under control?

We have been at unusual pains to set out very fully the testimony pro and con and made this opinion for that reason unreasonably long, so that it may be made obvious that this judgment should not be affirmed, unless the testimony of every witness for appellant should be disregarded, and that of appellee, who testified by deposition, should be credited.

We have carefully read all the propositions and assignments presented, and do not think from the view we take of this case it is necessary to discuss them, as they may not again arise, and confine our opinion to the question presented, that the court erred in not setting aside the verdict of the jury and granting a new trial. This ground is well taken.

We are unwilling to let this judgment stand, and hereby reverse the judgment and remand this case for another trial.

### On Motion for Rehearing.

Appellee is in error in supposing that we did not consider and pass on all assignments of each party, for we did. We sustained the assignment challenging as error the refusal of the court to grant a new trial.

The reference to the excellent map was based upon appellee's statement in his brief, "Witness made a plat of the scene of the accident, showing the street, right of way, double car track, flagman's station," etc., and that his claim for damages was based upon the injuries appellee says he received, viz.:

"His arm was set and apparently has healed, but has no strength, and still pains him very much, especially at night; is larger and has a knot or a lump at the breaking; is sore, indicating a rising or an abscess condition, with little or no strength in it. The index finger on his left hand was amputated, the middle finger is larger and stiffer, and the other finger stiff. The wounds are not only permanent, but have been very severe and inflict much pain. He is a farmer, or day laborer, not capable of doing other work, and his capacity to do work and earn wages is much less than before the injury, and was caused by the injuries received at the time of the collision, leaving him practically a one-handed man."

The execution of the map would seem to show him "capable of doing other work." This statement in our opinion was merely an incidental statement of a fact in the record, not having any bearing in the case, but merely referred to again because appellee seems to level so much criticism at this statement, and seems to wish to place the writer in a false position. We know there is no higher obligation or more honorable one than in honest labor. There are many highly educated men in civil engineering no doubt engaged in labor as farmers or artisans. And it may be that appellee is capable of doing what it is said he did, and can now still do that kind of work for his living. However that may be, although it seemed to have impressed appellee much, it is beside the question—only an incident.

[4] Appellee has filed a very able brief in connection with his motion, with which we are much impressed. It is confined largely to a challenge to our holding on the alleged question of discovered peril. In support of that position, among other authorities, he cites the case of Wilson v. Southern Traction Co. (Tex. Sup.) 234 S. W. 663, as conclusive and seems to think that case should control this and that if we do not conclude this case is one of discovered peril then we are over-

ruling the Supreme Court. There is nothing new decided in that case, because, as said, the rule therein followed that contributory negligence is no defense in cases of discovered peril, in consequence of the great number of decisions on the subject. There is nothing different in our holding in the law on the subject, for it is still left to determine how far the facts in any case bring it under that doctrine. Ofttimes the cases differ in facts, more so than "one pea from another." If the danger here to appellee, who seemed to be riding to the very jaws of death, was actually imminent, and was discovered by appellant, and could have been averted by the means at the engineer's command, consistent with the safety of the train, duty to avoid the injury was absolute, the failure to do so partook of the nature of a wanton wrong against which no act on the part of appellee would have been a defense. We thoroughly agree with Mr. Justice Greenwood in what he says in the above case:

"For, we do not see how conduct can be characterized otherwise than as exhibiting reckless indifference to destroying human life or causing human suffering where it consists in failure to use ordinary care to avoid the infliction of death or serious bodily injury on another in a position of imminent peril, after it is realized that the imperiled person cannot or will not save himself. Railway Co. v. Shetter, 94 Tex. 199, 59 S. W. 533. And the civil consequences of such conduct should be the same as for a willful or wanton act. 2 Cooley on Torts (3d Ed.) p. 1442." 234 S. W. 665.

We have the testimony of the engineer undisputed saying he was watching the sign of the flagman, giving him the right of way as he was backing and signifying to the public to stop, and before he discovered anything unusual the tender was about 15 or 20 feet across the street, perhaps beyond the crossing, the bell was ringing continuously and he was looking back towards the crossing all the time, right at the crossing—saw the flagman all the time—as soon as he saw that appellee was not going to stop and turned and started down the track, "saw there was going to be an accident, and I turned around just as quickly as I could, you know, to get hold of my brake valve and release. I threw the engine in the forward movement to make a quick stop. I stopped in about 12 or 15 feet, anyway." He could have done no more, for he was required to act only after the discovery of the peril—not before. There was no evidence of "reckless indifference to destroying human life or causing human suffering * * * after it is realized that the imperiled person cannot or will not save himself." We are not overlooking the modification of that doctrine, which had its inception perhaps in the last clear chance—or to wait, look, listen at railroad crossings, etc., holding the injured party to his contributory negligence, which step by step has deprived a defendant of the right to urge against the recovery because it was the injured party's own fault, until it is now said:

"The pronouncements of this court (Sup.) denying the defense of contributory negligence in discovered peril cases have been progressively more and more emphatic."

So contributory negligence is no defense in discovered peril cases and this has become the settled law. Still, Mr. Justice Greenwood said, in Wilson v. Southern Traction Co., supra:

"For, in order for an act or an omission of a plaintiff to constitute contributory negligence in any personal injury case, it must not only amount to a want of ordinary care, but it must, in concurrence with a negligent act or omission of a defendant, become the proximate cause of the plaintiff's injury."

[5] The defendant had a right to suppose under the circumstances, and to rely upon what seemed so plainly obvious to him, that appellee would obey the signal as others did, as well as see the engine and would stop as any sane or reasonable man would. This the engineer has shown he relied on, and when he saw appellee's real danger used all the means in his power to stop his engine and thus avert the danger. He uses some foolish words in his testimony that do not contradict the fact that he promptly acted when he discovered appellee's real danger and his utter disregard of all surrounding facts obviously within his knowledge and under his observation, but was nevertheless not going to stop.

There is nothing new presented in the motion that was not before urged, and the motion is overruled.