**GALVESTON, H. & S. A. RY. CO. v. FREEMAN. (No. 8554.)**

(Court of Civil Appeals of Texas. Galveston. Dec. 12, 1924. On Rehearing, April 8, 1925. Further Rehearing Denied May 14, 1925.)

**1. Appeal and error ⬀989—Appellate court looks to evidence as whole in determining whether verdict contrary to weight of evidence.**

In determining whether or not verdict is unsupported by evidence, the court considers evidence most favorably to plaintiff and rejects that favorable to defendant, but in determining whether it is so contrary to weight of evidence that it cannot in good conscience be permitted to stand appellate court looks to body of evidence as a whole.

**2. New trial ⬀72—Railroads ⬀350(7, 13)—Negligence and contributory negligence at crossing held for jury.**

In action for injuries from collision at crossing, questions of negligence in not having engine bell ringing and contributory negligence held for jury, and special findings for plaintiff not so clearly wrong as to require trial court to set them aside.

**3. Trial ⬀232(2)—Requested special charge as to contributory negligence in crossing collision held properly refused.**

In action for injuries from collision at crossing, where both negligence and contributory negligence had been clearly and properly defined, and the issue of contributory negligence in general had been submitted to jury, held that defendant's requested special charge on contributory negligence contained no such explanations and definitions of legal terms as were necessary to enable jury to render verdict on such special issue, under Vernon's Sayles' Ann. Civ. St. 1914, art. 1984a, and was properly refused.

On Motion for Rehearing.

**4. Railroads ⬀327(8)—Failure to look where one could reasonably expect to discover train is negligence barring recovery.**

If one about to cross a railroad track, over which he knows trains frequently pass, fails to look or listen for train at some point where he might reasonably expect to discover it, such failure is negligence, barring recovery for injury, unless there is proof of discovered peril.

**5. Trial ⬀350(7)—Refusal to submit special issue as to whether plaintiff could by exercise of ordinary care have seen approaching train in time to avoid collision held error.**

Under Vernon's Sayles' Ann. Civ. St. 1914, art. 1984a and Rev. St. art. 1985, in action for injury from collision at crossing, it was duty of trial court, on request, to submit separately each group of facts relied on by defendant tend-

ing to show contributory negligence, though defendant charged contributory negligence in general terms, and, where there was evidence that, if plaintiff had looked or listened for train at point where he could reasonably have expected to discover its approach, he would have seen it in time to have avoided collision, refusal to submit requested special issue thereon was error.

Graves, J., dissenting in part on rehearing.

Appeal from District Court, Harris County; J. D. Harvey, Judge.

Action by Max Freeman against the Galveston, Harrisburg & San Antonio Railway Company. Judgment for plaintiff, and defendant appeals. Reversed and remanded on rehearing.

Baker, Botts, Parker & Garwood, and Garrison & Watson, all of Houston, for appellant.

Fouts & Patterson, of Houston, for appellee.

GRAVES, J. Appellant's statement of the nature and result of the suit, so amended as to substitute for its summary thereof the full text of the special issues and the jury's answers thereto, is adopted as correct:

"On February 27, 1923, plaintiff filed his first amended original petition in the district court of Harris county in this suit, in which he seeks to recover damages against the Galveston, Harrisburg & San Antonio Railway Company in the sum of $33,700, alleging, among other things, that on or about the 2d day of September, 1920, while driving a large truck in a westerly direction along the public highway in the county of Harris, said highway known as the La Porte road, he was struck by a train of the defendant company, where said highway crosses the track of said company at the crossing known as El Buey crossing, inflicting serious injuries upon the plaintiff. Plaintiff alleges that at the time of the accident he was driving his truck at the rate of about 5 miles per hour, and was using all reasonable diligence to ascertain whether or not a train was approaching said crossing. The acts of negligence charged against the defendant are:

"(a) That the defendant, its agents, and servants, as its train approached said crossing, failed to ring the bell or blow the whistle on said engine at a distance of at least 80 rods from said crossing.

"(b) That the defendant was negligent in permitting the crossing bell to get out of repair, so that it would not ring, or, if it did ring, would not ring loud enough to be heard by one approaching said crossing, thereby failing to give warning to travelers on said highway as they approached said crossing.

"(c) That the defendant was negligent in operating its train at a rapid and dangerous rate of speed, and without keeping a proper lookout to see if persons were approaching its track at said crossing.

"(d) That the defendant was negligent in failing to have an adequate signal bell installed at said crossing, which would ring loud enough

to give persons approaching said crossing notice of the approach of a train thereto.

"(e) That the defendant's agents and servants were negligent, in that they did not use ordinary care to prevent the accident after discovering the perilous position of the plaintiff.

"(f) That the defendant was further negligent in allowing and permitting weeds to grow to a great height on its right of way, to such an extent as to obstruct the view of persons approaching the defendant's track of any approaching trains.

"The defendant answered by general demurrer, general denial, and a plea of contributory negligence.

"On the trial of the case, and after the evidence was concluded, the defendant filed a request for a peremptory instruction, which request was overruled. Thereafter, and in due time, defendant filed its exceptions and objections to the court's charge, which were by the court overruled.

"The case was submitted to the jury upon the following special issues:

"Special Issue No. 1. Did those in charge of the locomotive fail to sound the whistle thereon at a distance of at least 80 rods (440 yards) from the public road and crossing? You will answer 'Yes' or 'No.' The jury answered, 'No.'

"Special Issue No. 2. If you have answered 'Yes' to the next preceding special issue No. 1, then was the failure to thus sound the whistle the proximate cause of the injuries to plaintiff? You will answer 'Yes' or 'No.' The jury did not answer this issue.

"Special Issue No. 2a. Did those in charge of the locomotive fail to commence ringing of the bell at a distance of at least 80 rods (440 yards) from the public road and to continue to ring the bell thereon until the collision occurred? You will answer 'Yes' or 'No.' The jury answered, 'Yes.'

"Special Issue No. 2b: If you have answered 'Yes' to special issue No. 2a next preceding, then was the failure to thus ring the bell the proximate cause of the injuries to plaintiff? You will answer 'Yes' or 'No.' The jury answered, 'Yes.'

"Special Issue No. 3. Was the crossing bell at the crossing where the accident occurred ringing as plaintiff, Max Freeman, approached said crossing at the time of the accident? You will answer 'Yes' or 'No.' The jury answered, 'No.'

"Special Issue No. 4. If you have answered the next preceding special issue No. 3 'No,' then was the failure of the bell to ring due to negligence of the defendant as that term has been heretofore defined to you? You will answer 'Yes' or 'No.' The jury answered, 'No.'

"Special Issue No. 5. If you have answered the next preceding special issue No. 4 'Yes,' then was such negligence a proximate cause of the accident and resulting injuries to plaintiff, Max Freeman? You will answer 'Yes' or 'No.' The jury did not answer this issue.

"Special Issue No. 6. Did the defendant permit its right of way on the date of the accident to become grown up with weeds to such an extent that it obstructed the view of the plaintiff and prevented his seeing the approaching train? You will answer 'It did' or 'It did not.' The jury answered, 'It did not.'

"Special Issue No. 7. If you have answered the next preceding special issue No. 6 'It did,'

was the defendant negligent in permitting its right of way to be so overgrown with weeds? You will answer 'Yes' or 'No.' The jury did not answer this issue.

"Special Issue No. 8. If you have answered the next preceding special issue 'Yes,' then state was such negligence the proximate cause of the collision and resulting injuries to Max Freeman? You will answer 'Yes' or 'No.' The jury did not answer this issue.

"Special Issue No. 9. Did the plaintiff in approaching the railroad crossing on the occasion in question fail to use the care that a man of ordinary prudence under the same or similar circumstances would have used to discover the approach of the train and avoid collision therewith? You will answer 'He did' or 'He did not,' as you find the fact to be. The jury answered, 'He did not.'

"Special Issue No. 10. If you have answered the next preceding special issue No. 9 'He did,' then answer this issue: Was such failure negligence, as that term has been defined to you? You will answer 'It was' or 'It was not.' The jury did not answer this issue.

"Special Issue No. 11. If you have answered the next preceding issue No. 10 'It was,' then was such negligence the proximate cause of the collision and resulting injuries, if any? You will answer 'It was' or 'It was not.' The jury did not answer this issue.

"Special Issue 12. What sum of money if paid now will fairly and adequately compensate Max Freeman for the injuries alleged and proved to have been received, if any, in the collision in question, taking into consideration exclusively the following elements of damage: (a) Mental anguish and physical suffering by him in the past, and such as are reasonably probable to him in the future, if any. (b) The reasonable value of the loss of his earnings, if any, from the date of the collision in question to the date of the trial. (c) The reasonable present value of his diminished capacity to perform service and earn money in the future beyond the trial. (d) The reasonable value of medical attention up to the time of the trial, if any? You will answer this question by stating the amount, if any, you find. The jury answered, '$10,000.'

"The defendant, in due time, filed motion to set aside the findings of the jury to special issues 2a and 2b for the reason that said answers were not supported by the evidence, and were against the great weight and preponderance of the evidence, which said motion was by the court overruled.

"On motion of the plaintiff judgment was entered in his favor against the defendant for the sum of $10,000."

The railway company seeks relief from the recovery so decreed against it through this appeal.

It is apparent from the verdict so returned that, aside from the fact of injury and the fixing of an amount for damages, the recovery awarded depends upon the jury's adverse answers to appellant on special issues Nos. 2a and 2b, finding it guilty of negligence in not ringing the engine bell continuously throughout the full distance of the 80 yards next back from the crossing, and on No. 9, finding the appellee was not guilty of the contributory negligence it had charged against him, allowing, of course, for such relation as the finding under issue No. 3 that the stationary bell at the crossing was not ringing as Freeman approached it sustained to that under No. 9, acquitting him of contributory negligence; in other words, all other issues being found in appellant's favor, the judgment must stand, if at all, upon those thus determined against it.

Its first contention on the appeal is that its request below for a peremptory instruction should have been granted, because: (1) There was no evidence to support the allegations of negligence charged against it and none showing that its acts, if negligent, proximately caused the injury; (2) the undisputed evidence showed that appellee was guilty of contributory negligence as a matter of law; subsidiarily it is also insisted that the trial court should have set aside the jury's finding upon all these issues as being so against the great weight and preponderance of the evidence as to be clearly wrong.

As the questions thus raised turn upon the sufficiency of the evidence to support the judgment, we quote, with some slight deletions, this summary of the testimony from appellee's brief:

"Miss Gladys Hargrave, witness for plaintiff, testified as follows on direct examination:

"'As I came from Pasadena towards Houston in September, 1920, there were signboards, and the grass was very high there too, which obstructed my view down the railroad track toward Houston. There were some signboards between the railroad and the road the way you come up, and the grass is high there too. That kept you from seeing the train. After you pass over that crossing coming in, there is a bayou or stream of water; there are a great many trees along the edge of that bayou. The railroad crossing curves after you pass the crossing as you come towards Houston. I have not examined that crossing recently. I notice it, though, when I pass. I often pass when trains are coming up, you know, and I usually notice whether you can see the train or not. Sometimes you can hardly see it.'

"On cross-examination she further testified:

"'It is several feet from that turn to the track, I do not know just how far. I did not see it as soon as I looked. Just after we made the turn there we could not see it; we could not see the train at all in some places; just after we made the turn we couldn't see it. If you drove on a little bit further you could see it. After we made the turn, we could not see the train. The reason we couldn't see it was on account of the grass and the large signboard. That large signboard is between the Sinclair fence and the railroad fence. It is not over on the Sinclair side. There is a right of way fence and wire fence there. That signboard was between the road and the railroad in a way. The signboard I am speaking of was not inside of the Sinclair fence; standing next to the Sinclair fence. I don't remember the name on the sign. There was a large sign hid the view of the train. Of course the sign wasn't larger than the train,

but the train was off, and of course you could not see it. This signboard I am speaking of, right after you made the turn, it was between you and the railroad. (Witness was handed a photograph.) That looks like the road after we made the turn after the sign was removed. I saw some signboards there. I see a train there. Those signboards may have been there, but they are smaller. There is one large one. There are smaller ones. This one looks something like the crossing there. This is the crossing before you make the turn. I see a train there. (Another photograph.) Here is another one. I can see back of the automobile, looking towards Pasadena, the automobile is towards Pasadena, but there is a large sign between. The two large signs from here are not as large as the one that was there then. I don't know just how large that was. The one I saw was at least three times as large as that shown in the picture; it was a large sign, a great deal larger than those. It is maybe more than three times as large as that one in the picture. Those trees down there on the bayou do keep you from seeing the train a good ways off. Oh, you can't hardly see it from there; it seems to blend in some way; it is always dark. After we got close up, they didn't keep us from seeing that engine. After we passed the trees, they didn't keep us from seeing that big engine. The trees that are behind the engine didn't keep us from seeing it, you cannot usually see it as plain, it is always dark, but that didn't keep us from seeing it.'

"On direct examination she testified:

" 'I don't know when these photographs he has shown me were taken. I don't know whether or not the same signboards are in the photographs as were there in September, 1920. I know there was more, but they may have been there too, some small ones as well as large ones.'

"L. L. Hargraves, witness for plaintiff, on direct examination testified:

" 'In going from Houston to Pasadena in September, 1920, there was some signboards at that crossing that obscured, or tended to obscure, your view of trains that were going from Houston towards Pasadena. Those signboards were near the cross fence that is run from the cattle guard over to the Sinclair fence, right parallel with that cross fence. I say there is a cross fence that runs from the cattle guard to the Sinclair fence. That cross fence is about 50 feet long, I judge. Those signboards on that cross fence were just inside of the public highway between the cattle guard and the Sinclair fence. They were not facing the Sinclair fence, parallel with the fence. I have had occasion to examine the ground around that cross fence that runs from the cattle guard to the Sinclair fence to ascertain whether or not I could locate the position of the signboards. I seen something there that looked like it might be where those signboards had been taken up, some holes and a trench laid through, the ridge in the dirt there that is cut for the signboards. The first hole is about 25 feet from the railroad track; there was a hole there, and then a trench began there too right near that hole. In September, 1920, there was quite a bit of underbrush growed up there on the right of way, and there is right now, poison oak is what I call it, on the fence. It is, I judge, about 5 feet high now. I guess you would call that fence the Sinclair fence. It

might be a railroad fence. I don't know whether the Sinclair property reaches on down towards the bayou or not. There is cut and embankment in there. I judge that embankment is about two feet high. I have not measured it. The growth on the right of way may not be quite as high now as it would be later in the season. The embankment or cut is the same as it was in 1920. After you pass the fence that runs from the Sinclair fence down to the cattle guard or railroad right of way, there is another off set fence that runs perpendicular to the railroad proper towards Houston. It is a little better than 100 feet down towards Houston, it jogs over within about 20 feet of the railroad, something near 20 feet. There is a growth on the corner of that fence nearest the railroad that jogs over; I would call it poison oak, it may not be, but, then, it looks very much like it. That growth was there in September, 1920. I believe it was higher then than it is now. That little mound or embankment is right about where that jog sets in that is 100 feet or more from the fence that leads from the cattle guard to the Sinclair fence, and it runs back. They begin to dump the dirt just outside of the ditch. It extends towards the crossing, and follows parallel with the railroad. There is a growth of weeds or other substance of some character on that embankment. The bayou is between that crossing and Houston. In September, 1920, coming from Houston to Pasadena as you approach that El Buey crossing going towards Pasadena, there were some signboards in there that obstructed or tended to obstruct your view of trains that approached the crossing from towards Houston. There was also the high fence and then that underbrush. It would all tend to hide your view when the train approached. I have seen that crossing lately. I have stated as to how it compared with 1920.'

"J. R. Marr, witness for plaintiff, testified as follows:

" 'I did not hear the bell on the engine ringing before I got to the crossing.'

"R. A. Burch, witness called by plaintiff, testified as follows:

" 'In traveling from Pasadena towards Houston I have had occasion to observe the condition existing at the right of way as you come towards Houston. Along about September 2, 1920, at the time of this accident, there were some sign boards there. (Counsel explained the different points on the blue print heretofore used.) This from "G" to "D," and on represents the Sinclair woven wire fence. I suppose those signboards I saw were right along there (at point marked "O"). There were also some signboards sitting back along in here (towards Pasadena) along this line of fence. I don't know whether they were the other side or this side. There were also two or three signboards right along here together, then there was one farther down, just about straight with this road here (county road, referring to photograph marked "C"). Those are some of the same signboards I saw on the date of this accident. I am pretty sure there was more signboards there than I see in the picture; in fact, I am sure there was.'

"J. G. Brill testified as follows:

" 'On September 2, 1920, coming from Pasadena, it seems to me what bothered me more than anything else was the signboard, then across the track was some high boards made

a background. Then there was the bank of that railroad that had—it looked like high weeds on the off side like, and also high weeds on this side, probably 4, probably not over 3, feet, some of them along about 3 feet. It didn't look like it would bother a person so much only for that tree background, which bothered me. When there was a train coming from Harrisburg, if I saw it looking right straight down at it, it was all right, but if it got on a line with those trees before I saw it there it bothered me.'

"L. K. Kitchen, a witness called by the defendant, said:

"'I did not hear the bell; I could not say nothing about the bell; I did not hear it.'

"J. F. Hildebrandt, the conductor on defendant's train, called by the defendant, testified:

"'I could not say now whether the bell was ringing or not. I was behind a couple of cars and could not tell. As I passed that crossing just before the accident the automatic bell was ringing.'

"On cross-examination he further testified:

"'As we came back from Manchester we had some switching to do at Sinco; then we had to go back and pick up our train, "put the cars in the barn," and we were through. I don't know what I testified to, but I said just awhile ago I was not sure about the fireman ringing the bell. I testify that now. Coming back that was an engine and two cars. I was on the rear car, a flat car. None of those cars were box cars. One was a coal car. That is a comparatively shallow car. It doesn't stick up as high as the cab of the engine or the oil tank. I knew we were expecting to find a train in the switch down there. * * * I never saw Mr. Freeman until the time of the accident. I saw him just an instant before he was struck. I got an instant's view of him before. At that time I was on the rear car; the second car from the engine. I know the engineer reduced his speed, because it made me think this man was coming out of the switch I had to do my work on. He shut off his engine just an instant before he he got to the distance signal—just before we got to the caution signal. That was about 10 car lengths from the crossing. It is slightly down grade to the bayou. When the engineer got to the distance signal the speed was reduced. The accident did not happen then. And then we went along. You have got about 500 feet as you remember there. The next thing I knew one of my brakemen, Rossiter, said, "Look at that fellow." * * * I looked over the edge of the car, and I seen an automobile truck, the gentlemen, Mr. Freeman, in it. At about that time we hit. I just got an instant picture of it. When I saw him it looked to me like the front wheels of his truck were on the first rails of the track. The engine must have been about 15 or 20 feet from the crossing—I just got an instant picture. The truck was going very slow; it appeared to me to be standing still; it just looked like he drove up there and stopped—it looked to me like when I saw it.'

"He further says:

"'My mind was centered on getting into Manchester in time to let the passenger train out.'

"J. Rossiter, brakeman, called by the defendant, said:

"'I don't remember now whether the engine bell was ringing or not.'

"He further said on cross-examination:

"'We were going back to Sinco to do some switching. When we got through there we were going back to Manchester and couple up and take out and go home; that is the last thing I had to do that day. When I first saw him and his car standing—the front wheels were on the track on this side, and he was standing up like this, like he was going to get out. This is the first time I saw him. At that time I judge the pilot of the engine was standing right at the cattle guard. * * * I was standing on the end of the flat car, on the back end of the last car. I was standing on the left-hand side of the train, the fireman's side, as we were going to Galveston. I was standing up holding against the stake of the car looking around towards Sinco. The other local crew was in there, but I was looking to see whether he was coming out on the main line; when he came out on the main line he was the one that throwed that board, and I was seeing if he was coming out of there. When I lined up the switch at Harrisburg, the switch was on this side, and I crawled up on that side, and was standing there all the time. I was standing up looking out at the side of the car. My view was unobstructed. I could see down there. I wasn't looking in particularly that direction from the time I left Simms Bayou, I was standing there facing that way. In other words, when he began to slow down, I thought that the caution signal was against us. I looking down for the local. When I felt it slow down, and when I first saw Mr. Freeman, he was fixing to jump, and at that time we were right on the track.'

"The engineer, A. J. Harrell, testified that he blew the whistle at the whistling board, and that the fireman was ringing the bell from the whistling board to the crossing. He further says:

"'I passed the yellow board before I got to the crossing, the yellow board is the caution signal. * * * Then I reduced speed, kind of slowed down to comply with the rule. * * * I had already reduced speed when I passed the yellow board, and that was some little ways from the crossing.'

"With reference to his view of the track, the engineer says:

"'I can see right out in front of the pilot, I don't know just how many feet in front of it, but if you look out the front window you can judge about how far you can see the track, about 30 feet ahead of you; I don't mean 30 feet ahead of the engine; I say I am sitting about approximately 30 feet from the front of the engine, and I can see the track right in front, I don't say an inch in front of the pilot, but I can see directly in front of it. If there were a hat right in the middle of the track it would be hard to determine how close I would get to that before it would disappear from my view; I couldn't tell you without actually getting on the engine about the hat, because when I tell you I can see pretty well directly in front of the engine I could not give you the approximate distance in inches of it. I might give you that distance within 30 feet; I am sure I can see it much closer than 30 feet. I am sure I can see it much closer than 30 feet. It would be hard to determine how much closer without actually trying it out. I am sure I could see the hat within 15 feet.'

"He further says:

"'As we went along the road I never saw Mr. Freeman at all; I never did see him. That is

not so much of a curve there, I don't know what degree it is; that is about as light a curve as any we have on that division; it is slightly upgrade. Going down the railroad track, looking out my window, I can see all of the right of way 50 feet ahead of me, in fact, 50 feet ahead of me I can see more than our right of way. * * * After you get on the straight track 100 feet ahead of you you can see 25 feet or 30 feet on either side of the right of way. * * * When you are 100 feet back from the highway you could not see the curve in the road there and the crossing on the left-hand side, because the curve around is on the other side of the engine from me. (At this point witness was shown a blueprint which is attached to the statement of facts, and your honor's attention is directed to this blue print.) Supposing the distance from "C," to the crossing to be 154 feet, that is opposite "C," it is my impression that when I reach opposite "C" that I cannot see the middle of this highway here. * * * I could not see the signal bell; if I could see that, I would have just about as good a chance to see a party. It is my impression that on account of the curve in the road I could not see that signal bell 100 feet back; that is, my impression now.'

"With reference to the noise made by the engine, Harrell further testified;

"'As we approached that crossing I had practically shut off my "juice," and was coasting under my power. I shut off just enough to reduce the speed of the train. I might have been just easing along a little bit. You see, if I reduced the speed that would be complying with the rule. Rules are what makes the railroad safe. That is what they preach to us. I couldn't say definitely I wasn't pulling any at all, I might have been. I might have been just practically enough to just ease along there slowly. On the former trial of this case I was asked these questions and made these answers:

"'"Q. The momentum you had gotten from Manchester to that crossing was sufficient to maintain the speed you wanted, wasn't it, by slowing down? A. Yes, sir.

"'"Q. The engine wasn't pulling it any then, it was just sliding in? A. Yes, sir.

"'"Q. That is a fact, isn't it? A. Just rolling along.

"'"Q. And you heard the whistle back there at the whistling post? A. Yes, sir."

"'On redirect examination Mr. Garrison asked me the following questions (on the former trial), and I made the following answers:

"'"Q. Did you wait until you got to the caution signal or did you slow down as soon as you observed it, before you got to it; which was it? A. As soon as I observed the signal I shut the engine off, and that is practically slowing down to some extent, and then the rest of the slowing generally was done with the brakes.

"'"Q. Now, as you approached the crossing that way, slightly up grade or slightly down grade? A. Slightly up grade.

"'"Q. Was your engine working steam as you were going up that grade? A. Until I got close to the caution signal, and then I shut the steam off.

"'"Q. Then what carried your engine on? A. The momentum; we were going about 18 or 20 miles an hour. I was not working steam;

we might shut a throttle off to where—they have what they call relief valves; as soon as those relief valves were closed, the engine would have a little steam, but it could be easing along slowly. The exhaust of the engine wasn't making very much noise, if any."'

"The fireman, W. A. McCullough, testified that he rang the bell from the whistling board up to the time of the accident.

"J. H. Knowles, division engineer for the railroad, testified with reference to the right of way at the point of the accident. The witness was testifying from a blueprint attached to the record:

"'The right of way on the crossing there is 50 feet on either side. From the cattle guard to "X" is the right of way. From "X" to "Y" and from "Y" to "C" is the right of way, and then on down.'

"The witness testified with reference to the curve as follows:

"'This is a light curve down there. (Witness was shown J. S. Boyles' map, and attention called to O.669.) That is the grade. The map shows this to be 1 degree curve with central angle of 28 degrees and 41 minutes. In plain English, that means that for every 100 feet distance the direction changes 1 degree central angle; in other words, a circle would be 360 degrees. The direction changes 1 degree from the tangent for every 100 feet distance. Two degrees would be a change in direction of 2 degrees for every 100 feet distance. It is based on 100 feet.

"'Q. I am not an engineer and I cannot follow you. Suppose you have a point 100 feet —from that cattle guard 100 feet back. A. Yes.

"'Q. With this degree curve we have, then you draw a straight line from the point of the curve 100 feet back to the cattle guard. What will be the distance of that from a tangent to the circle in inches or feet? A. Well, that requires calculation.

"'Q. Can you calculate it? A. No; I cannot. I haven't the formula in my head. It is a very small amount, though.

"'Q. Have you any idea? Would it be 3 inches? A. It would be more than that, I think. You mean the tangent to the curve at this point and the distance from there to the curve?

"'Q. Yes. A. Oh, 2 or 3 inches.

"'Q. Then, of course, 30 feet would be— A. —one-third of that. It varies directly as the distance.

"'Q. That is what I wanted.'

"C. N. Kitchen, witness called by plaintiff, and a brother of L. K. Kitchen, witness called by the appellant, testified:

"'We were eating (L. K., S. A., and C. N. Kitchen), and we did not hear any whistle or bell.'

"Mr. Davis, claim agent for the appellant, called by the appellant, testified as follows:

"'I was out there next morning after the accident. The condition of the track and roadbed and weeds were practically the same when the pictures were taken as when I was out there the next morning. I am connected with the claim department of the Southern Pacific and Galveston, Harrisburg & San Antonio. I went down there the morning after the accident. These pictures were made around 30 to 60 days. I knew of the accident; that was the purpose of my going down there the next morn-

ing. It is in my duties to go around and investigate and find out the facts as well as I can and make a permanent record of it .for use, if need be. * * * The photographer did not go down with me. I carried him down there later, after the accident. I could not swear it was exactly 60 days after the accident.'

"On cross-examination he said:

" 'Some time after the accident I had some photographs taken of that crossing down there. That was around 30 or 60 days after the accident, I think it was in November after the accident, I won't be positive.'

"He further said:

" 'My purpose in going down there was to investigate the accident, to determine as nearly as it was possible, exactly how it happened, with the purpose in mind of eventually handling a claim, if one originated, and for reporting to my superior officers how such accident had occurred.'

"Plaintiff, Max Freeman, testified:

" 'I .am the plaintiff in this case. On the 2d day of September, 1920, I was coming home from the Sinclair refinery. I was out there to make a deal, and I was going home from there on the La Porte road. I had a Kelly Springfield two and a half ton truck. It did not have a cab on it; it was an open truck. I left there for Houston a little after 5 o'clock. The La Porte road runs parallel with the road from Pasadena towards Houston, towards the El Buey crossing. On that occasion I approached the El Buey crossing, and the train ran into me. At the time when I approached the crossing I was traveling with my truck at about 5 or 6 miles an hour. It was a heavy, big truck, a Kelly with chain drive, and the most I could have made was about 12 miles an hour. I was going about 5 miles an hour before I made the curve. After I made the curve I slowed down to about maybe 2 or 3 miles, and I looked, and I didn't see no train. I looked first to my left, naturally, because I was going towards Houston. As you came towards Houston Pasadena is on my left, and I looked down, which you face straight with the track practically, and I didn't see no train, and when I made the curve my front wheels got on the track, when I got hit; it was a right-hand drive; I was facing my side towards Houston. There is a crossing bell at that crossing. It did not ring on this occasion. I know for what purpose that crossing bell was installed. I had heard it ring in crossing. I relied upon that crossing bell for warning of approaching trains naturally like any ordinary human would rely to a certain extent on a bell which is made for that purpose, to give a man a signal that a train is coming. As to what precaution I took to observe and see a train approaching as I crossed the crossing I could not see any more than any ordinary person would do by looking to my left, to my back, to see whether a train comes from my back, and looking straight ahead with the track, where practically there was so many billboards, I could not see if there was a train, and I didn't see no train. Naturally I went on. I looked down towards Houston to ascertain whether or not a train was approaching, I didn't see no train. I did not hear a whistle or bell rung on the train that struck me. * * * At that time the weeds at El Buey crossing were way up high, and the billboards were facing you coming down on that road. (Witness was shown a blueprint and the different locations pointed out to him.) The. signboards were right here and this point right here, between this here and this point right here (putting his finger on the point "X" to the cattle guard.) I do not know how many signboards were there. Those weeds were from here (indicating fence marked "X" to the cattle guard). Now there is another fence·runs over this way (indicating "Y" to "C"). That was full, to the best I can remember, of these coffee beans or weeds. Then from there down here is trees on both sides; that is, from the bayou up this way, on both sides of the track. I do not know how many signboards were there. This photograph (marked "C") does not indicate all of the, signboards or posters that' were there. It would not be possible to see because, when that accident happened, why right from this cattle guard about 30 or 40 feet—I don't know the distance between this cattle guard and Sinclair right of way, which runs about from there up the road—that fence was filled up with signboards; absolutely, when a man would try to look for a train, those little boards would obstruct his view, you couldn't see if you tried. At the time when I was going I looked practically on both sides, and, if I would travel, say, 20 or 30 miles, that would be possible to believe, but I am going an average of 5 miles at that time, and I looked for the train both ways, and I didn't see no train; those billboards were right in front of you. * * * The road runs parallel with the track. When it gets right close to the track coming west, it curves and goes almost at right angles across the track. Before I made the curve, I looked to my left and back. I was at the curve when I looked to my right; I was then making the curve when I looked to my right. When I started to make the curve, I looked to my left, and then back of me, and then I looked straight ahead. When I made the curve, I looked backward and then I looked forward. I did not look towards the crossing where the road crossed the track; I looked to my right. I could not tell you how many feet my truck was from the track when I looked to my right; I cannot give you my best idea, because I don't remember 'that. I was watching closely, but I did not watch the feet to see how far away I was from the track. I will not say how many feet I was, because I don't know. I looked to my back and to my right, and I didn't see no train, and I went on. Whether I looked to my right more than once is something I don't remember. Whether I looked more than two three times I don't know, but I did look to my left and right. Just as I was ready to make my turn I looked to my left. Just as I reached the turn in the road I looked to the left. I don't know how far I went after looking to my left before looking to my right, I couldn't say how far, I don't know at all. I could not give you my impression, because I don't know. I cannot give you any idea, because I don't know. I know I went as any human would travel to be careful. * * * Naturally, I was listening for a bell. Every time I went to a crossing I generally was listening for a bell or a whistle. Sure I listened for a whistle. I expected it to whistle either way—some trains whistle—I don't know which way I don't know nothing about it whistling 80 rods from the crossing. I didn't hear no bell ringing. I would say it didn't ring because I

didn't hear it. I didn't see the engine. I didn't hear any noise from it. How could I say it made noise when I didn't hear it? I say the bell wasn't ringing, because I didn't hear it. I did not hear the engine making any noise. If the engine made any noise, I did not hear it. Naturally, I was relying solely on that crossing bell ringing. There is a bell that has been there many years, and naturally I relied the first thing to hear the bell that the train was coming. I was relying solely upon that bell ringing. As to the definition of the term "relying solely," will say "relying," the best I can get the definition, is depending on the bell to ring. I don't know what "solely" means. I did not rely on that crossing bell, and that crossing bell alone, to give me warning of the train. I looked first, and then, when I didn't hear no bell, I looked to my right, and I didn't see no train, and the bell didn't ring. That is all I can explain about it. When those three things occurred, I went on.'"

[1] As we understand the rule upon the subject, before the court can set the verdict aside on the ground of no evidence, "it must consider the evidence in the record most favorably for the plaintiff from the position of the injured party just before and at the time of the accident, rejecting all evidence favorable to the defendant" (Barron v. Ry. Co., [Tex. Com. App.] 249 S. W. 825; Kirksey v. Traction Co., 110 Tex. 190, 217 S. W. 139), but there is no such limitation in determining whether or not the verdict is contrary to the weight of the evidence to the extent that it cannot in good conscience be permitted to stand. In those inquiries the court looks to the body of the evidence as a whole.

[2] After a careful examination of the statement of facts, including the testimony quoted, we think it plain that there was enough evidence to not only take the issues of negligence as to each party—inclusive of the effect thereof with reference to proximately causing the injury—to the jury, but so strongly so that this court may not properly say that their findings thereon are clearly wrong. The trial court therefore can neither be held to have erred in refusing the peremptory instruction complained of nor in declining to set aside the jury's verdict.

Appellant argues with much earnestness, under the citation of many cases, such as Schaff v. Verble (Tex. Civ. App.) 240 S. W. 597; Railway v. Edwards, 100 Tex. 22, 93 S. W. 106; Sanches v. Railway, 88 Tex. 117, 30 S. W. 431; Railway v. Dean, 76 Tex. 73, 13 S. W. 45; Haass v. Railway (Tex. Civ. App.) 57 S. W. 855, that the physical facts, as well as the testimony of all other witnesses, contradicted the positive testimony of the appellee to the effect that as he approached the crossing the engine bell was not ringing, that his view was obstructed, and that he both looked and listened for the train, but neither saw nor heard it, and conclusively show that he was guilty of contributory negligence as a matter of law in the manner of his approach.

In support of this position it is further urged that the jury properly found there were no obstructions to prevent the appellee from seeing the approaching train, and that the photographs of the scene in evidence, which, it is insisted, were undisputedly shown to represent conditions as existing on the date of the accident, although taken two months afterwards, also constitute unmistakable proof that he both could and must have seen the on-coming engine when anywhere within 100 feet or more of the crossing, if he had in fact looked.

Under a close study of the evidence we are unable to agree that these conclusions accurately reflect the state of it. In the first place, the stationary bell at the crossing was found not to be ringing at the time, and no attack upon that finding is made, while as to the engine bell the appellee positively swore it was not ringing, and was supported by the testimony of the witnesses Marr, Rossiter, and Hildebrandt, as well as by the situation of these persons and other circumstances. In the second, the jury neither did nor could, without disregarding the testimony of several witnesses, find generally that no obstructions to the appellee's view existed, but merely, in answering special issue No. 6, found that there were not sufficient weeds on the right of way to obstruct it. In the third place, at least one witness not only testified that these photographs did not correctly show the conditions as they existed at the time of the collision, but joined two others in corroborating the appellee in saying that there were sign boards there then to obstruct the view; see the testimony of Miss Hargraves, L. L. Hargraves, and J. G. Brill, supra. In the fourth place, it was shown by the testimony of the engineer himself that the power had been cut off at the time, and that the train was coasting, making very little, if any, noise.

We deem it unnecessary to further review the details of the evidence, which has been so fully quoted from, feeling satisfied that it does not present a case that must be ruled by the authorities appellant so cites and relies upon. The first contention is accordingly overruled.

The remaining presentment is that the court committed reversible error in refusing to submit appellant's special charge No. 2, and its special issues 1 to 12, inclusive, as follows:

"Special Charge No. 2. In connection with and as explanatory of special issue No 9 submitted by the court in his main charge, you are instructed that, if you find and believe from a preponderance of the evidence that the plaintiff, Max Freeman, as he approached the crossing in question, and when within a reasonable distance from said crossing, could have seen or heard the approaching train if he had looked and listened for same, and at such distance from the track that he could have stopped his truck

so as to have prevented the accident, and you further find and believe from the evidence that the plaintiff, Max Freeman, while within a distance of 20 or 30 feet of the track, if he had looked or listened for the train or engine, could have seen or heard said train or engine, and that he could have stopped his truck within that distance, and you further find and believe from the evidence that an ordinarily prudent person would have so done, then you are instructed to answer special issue No. 9 in the affirmative.

"Special Issue No. 1. Could the plaintiff, Max Freeman, as he approached the crossing, and, when within a distance of 110 feet from the crossing, by the exercise of ordinary care, have seen or heard the approaching engine and cars in time, by the exercise of ordinary care, to have stopped his truck so as to have prevented the accident? Answer, 'He could,' or 'He could not.'

"Special Issue No. 2. Could the plaintiff, Max Freeman, as he approached the crossing, and when within a distance of 50 feet from the crossing, by the exercise of ordinary care, have seen or heard the approaching engine and cars in time, by the exercise of ordinary care, to have stopped his truck so as to have prevented the accident? Answer, 'He could,' or 'He could not.'

"Special Issue No. 3. Could the plaintiff, Max Freeman, as he approached the crossing, and when within a distance of 20 feet from the crossing, by the exercise of ordinary care, have seen or heard the approaching engine and cars in time, by the exercise of ordinary care, to have stopped his truck so as to have prevented the accident? Answer, 'He could,' or 'he could not.'

"Special Issue No. 4. Were or were not there such obstructions as would prevent the plaintiff, Max Freeman, by the exercise of ordinary care, from seeing or hearing the approaching engine and cars when he was within a distance of thirty feet of the crossing? Answer, 'There were,' or 'There were not.'

"Special Issue No. 5. In what distance could the plaintiff, Max Freeman, have stopped his truck, running at the rate of speed of 5 or 6 miles an hour as shown by the evidence? Answer by stating the number of feet.

"Special Issues Nos. 6 and 7. Would the plaintiff, Max Freeman, if he had exercised ordinary care and prudence as he approached the crossing, and when within 20 or 30 feet of same, have seen or heard the approaching engine and cars in time to have stopped his truck so as to have prevented the accident? Answer, 'Yes,' or 'No.'

"If you have answered the above question 'Yes,' then you will answer the following question: Was the plaintiff's failure to see or hear the approaching engine and cars when he was within a distance of 20 or 30 feet of the crossing, in connection with the defendant's negligence, if any, a contributing cause to plaintiff's injuries? Answer 'It was' or 'It was not,' as you may find from the evidence.

"Special Issue No. 8. Would the plaintiff, if he had exercised ordinary care to ascertain the approach of the train when within a distance of 20 or 30 feet of the crossing, have seen or heard the approaching engine and cars in time to have stopped the truck and prevented the accident? Answer, 'Yes,' or 'No.'

"Special Issues Nos. 9, 10, and 11. Did the plaintiff, Max Freeman, when within a distance of 15 or 20 feet from the track, look for the approaching train? Answer, 'He did,' or 'He did not.'

"If you have answered the above question in the affirmative, then you will answer the following question: Did he see or hear the approaching train when he looked? Answer, 'He did,' or 'He did not.'

"If you have answered the above question in the negative, then you will answer the following question: What obstructions were there, if any, to prevent his seeing the approaching train and cars when he looked for same when he was within 20 feet of the track?· Answer by naming the obstructions, if any.

"Special Issue No. 12. Could the plaintiff, Max Freeman, when within a sufficient distance from the track that he could have stopped his automobile before reaching the track, by the exercise of ordinary care, have seen or heard the approaching train by looking or listening for the same?"

There is also in the transcript, but not carried forward into appellant's brief, a No. 13, which appellee quotes in his brief under recitation that appellant also requested it, to this effect:

"If you have answered special issues Nos. 1, 2, 3, 8, 9, 10, and 11 in the affirmative, or either of them, then you will answer the following question: Was such failure upon the part of plaintiff a contributing cause to plaintiff's injuries?"

The insistence here is that each of these inquiries related to specific acts of contributory negligence, made issues by the pleadings and evidence, which, if found to be true, would have constituted a complete defense to appellee's suit, and that their rejection, followed by the submission of the contributory negligence issue in a general way only under given issue No. 9, deprived appellant of an affirmative right, the case of Fox v. Dallas Hotel Co., 111 Tex. 461, 240 S. W. 517, being cited in support.

We do not think the position well taken. In the Fox Case the particular acts relied upon as amounting to contributory negligence were not only specially and distinctly pleaded, but were inherently of such a character as would have, if proved, both "established some material issue presented by the pleadings" and constituted a complete defense to the plaintiff's suit. In this cause no specific act of contributory negligence was declared upon; the plea being simply "that such injuries and damage were the result of plaintiff's own negligence and contributory negligence, wherefore he cannot recover."

The court's charge here, therefore, under special issue No. 9 as given, seems to have regularly followed the state of the pleadings upon this feature.

The Supreme Court in this Fox Case repeatedly makes plain its conclusion:

"In submitting either negligence or contributory negligence, special issues should be restricted to specific acts of negligence alleged and proven."

In Railway v. McGlamory, 89 Tex. 635, 35 S. W. 1058, and Ry. v. Gorman, 112 Tex. 147, 245 S. W. 418, the particular acts of contributory negligence were likewise specially pleaded.

Special Issue No. 9, as given by the court, correctly submitted the question of contributory negligence in general terms, together with proper definitions, and there is no claim to the contrary; the sole complaint being of its submission in that way at all as against appellant's particular theories of such negligence, which it had not pleaded as such. To entitle it to have them singled out and presented to the jury as the specific basis for affirmative relief, as we read the Fox Case, it was necessary to specifically plead them.

But, if that consideration be either inconclusive or unsound, then we think other essentials emphasized in the Fox Case were lacking here. That decision by no means abrogates the statutory and long-enforced rule that only ultimate fact issues, and not merely evidentiary matters, should be submitted. It quotes with approval the court's prior declaration to that effect in Railway v. McGlamory, 89 Tex. 638, 35 S. W. 1058. See, also, Texas, etc., Co. v. Winters (Tex. Com. App.) 222 S. W. 542; Cushman v. Masterson (Tex. Civ. App.) 64 S. W. 1033; McKeon v. R. R. Co., 94 Wis. 477, 69 N. W. 175, 35 L. R. A. 256, 59 Am. St. Rep. 910.

When analyzed in the form as tendered, we do not think any of these requested issues properly submitted "a group of facts, which, standing alone, would have, if proven, constituted a complete defense" to appellee's suit, and therefore fall within the condemnation of the statute as being evidentiary only. Revised Statutes, art. 1895. In one form or another they all seek to elicit, upon the one hand, either what the appellee could or would have discovered or might have done in certain contingencies or at a particular distance from the crossing, or, upon the other, what consequence would have flowed from a discovery made of an act occurring at a designated point, but under the settled rules of law unfavorable findings upon such inquiries would not have barred a recovery by him, because no single one of them goes far enough to comprehend a complete defense to his cause of action, nor do they embody the correct test of contributory negligence. At least, stated in general terms, the true rule is, not what could have been done or might have happened in particular intermediate conditions, but whether or not, under all the facts and circumstances, an ordinarily prudent person in the appellee's situation would have done substantially as he did. Barron v. Railway (Tex. Com. App.) 249 S. W. 825;

Hines v. Arrant (Tex. Civ. App.) 225 S. W. 767; M., K. & T. v. Merchant (Tex. Com. App.) 231 S. W. 329; Pearson v. T. & N. O. (Tex. Com. App.) 238 S. W. 1109; Trochta v. Railway (Tex. Com. App.) 218 S. W. 1038; Railway v. Wilkerson (Tex. Civ. App.) 224 S. W. 574; Railway v. Sterling (Tex. Civ. App.) 260 S. W. 320.

To have given this multiplicity of questions—a practice condemned in Cushman v. Masterson (Tex. Civ. App.) 64 S. W. 1033—it seems to us, would not only have been "to require the jury to give their views on each item of evidence, thus practically subjecting them to a cross-examination as to the entire case," denounced in 27 Ruling Case Law, at page 872, but to have permitted them to be confused by special charges upon the weight of, or giving prominence to, each circumstance introduced tending to support the defense, pronounced improper by our Supreme Court in M., K. & T. v. McGlamory, 89 Tex. at page 639, 35 S. W. 1058. It furthermore would have trenched upon the rule thus stated by the Commission of Appeals in Texas City Transportation Co. v. Winters (Tex. Com. App.) 222 S. W. 542:

"The particular manner in which the issues are presented is largely discretionary with the trial court. By the expression 'issues of fact' is not meant the various controverted specific facts which may enter into the main issues of fact, but only the independent ultimate facts which go to make up plaintiff's cause of action and defendant's ground of defense. If such ultimate issues of fact are fairly presented, the mode of presenting them by the trial court will not be reviewed. Nor will too great a generalization by the trial court be reviewed, even upon timely objection, in the absence of correct special issues tendered by the objecting party, unless there is affirmative error in the issue submitted by the court. * * *"

What appear to be other infirmities here are: (1) There was no inquiry at all as to whether any such commissions or omissions as might be found under these proffered queries constituted negligence; (2) despite the presence of the quoted No. 13, no proper one as to whether or not such dereliction as might be found amounted to a proximate cause of the injury; the objection to No. 13 being that it combines two or more issues which might be answered differently without discriminating between them. To refuse issues of that character has often been held not to constitute error. W. I. Co. v. Mackechnie (Tex. Civ. App.) 214 S. W. at page 462, and authorities there cited.

[3] As concerns appellants' special charge No. 2, we are unable to hold, in the circumstances here, that this request contained any such explanations and definitions of legal terms as were necessary to enable the jury to properly pass upon and render a verdict on special issue No. 9, as Vernon's Sayles' Ann. Civ. St. 1914, art. 1984a, requires to be sub-

mitted. Both negligence and contributory negligence had been clearly and properly defined, and given issue No. 9 then simply added an inquiry as to whether the appellee in approaching the crossing failed to use the care that a man of ordinary prudence under the same or similar circumstances would have used to discover the coming of the train and avoid collision with it. No further explanations would seem needful in answering so plain a question.

Aside from that consideration, however, the charge is ambiguous and confusing, as well as subject to some of the same objections applying to the refused special issues. To what portion of it the clause "and you further find and believe from the evidence that an ordinarily prudent person would have done so" applies is by no means clear. Just which one or how many of the various acts inquired about it seeks to have the jury ascertain does not readily occur. It therefore fails to meet the requirements laid down in the Fox Case, upon which appellant in this connection apparently relies. Moreover, under the authorities before cited, it would not have constituted contributory negligence even if the jury had found that appellee could have done at a specified distance what is here inquired about, because the true test is, not what could have been done under particular conditions or at designated points, but what, under all the contributing facts and circumstances, an ordinarily prudent person would have done. Barron v. Railway (Tex. Com. App.) 249 S. W. par. (3), at page 825, and cited authorities.

Further discussion is deemed unnecessary. The conclusions stated determine the questions raised, and require an affirmance of the trial court's judgment. That order has accordingly been entered.

Affirmed.

### On Motion for Rehearing.

LANE, J. Having made a careful review of the statement of facts and the facts recited in our opinion, the majority of this court have reached the conclusion that testimony of the witnesses Gladys Hargraves and others with reference to the question as to whether appellee could have seen and heard the approaching train which struck him, by the exercise of ordinary care, and other evidence of the same import, is not fully stated in our original opinion, and, as appellant by motion for rehearing complains of such statement, we here make the following additional statement.

It is shown by the undisputed evidence that the railway track of appellant, for several miles to the south of the public road crossing at which the accident occurred, runs practically north and south and parallel with, and a few hundred feet west of, said public road; that said public road, after running parallel with said railway for some miles, and about 250 feet east therefrom, turns westward at almost right angles and crosses the railway. On the day of the accident appellee was traveling said public road; going north toward the city of Houston. It is shown that said crossing is in the prairie, and that there were no trees nearer thereto than 300 or 400 feet, all of which were to the north thereof. It is shown by the photographs, introduced in evidence which were taken about 60 days after the accident occurred, together with other evidence given in connection therewith, that there was a right of way fence on the east side of and about 50 feet from the center of said railway track. The photograph marked "C" for identification shows a part of the public road just east of the railway and the cattle guard across the railway just north of the public road crossing. It shows that all the bill boards at this point were situated east of the right of way fence; that is, all the sign boards were east of the right of way of the railway company, thus placing them more than 50 feet from the railway track.

In view of appellant's complaint that the findings of fact as set out in the original opinion are unfair, in that parts of the testimony of several witnesses are copied into the opinion as a basis for the affirmance of the judgment rendered against it, and that parts of the same witnesses' testimony modifying, explaining, or changing the effect of those parts so copied are omitted, we here copy parts of the several witnesses' testimony omitted from the opinion as follows:

Miss Gladys Hargraves, after testifying that, after she made the turn to cross the railway track at the point of the accident, she could see an approaching train, said:

"I had come to Houston the morning of the day the accident occurred. I don't know just what time I left Pasadena, but I always left between 8 and 11. * * * I recall passing that crossing that morning. As we approached the crossing and got to it, a train passed over the crossing. * * * We had to wait for the train to pass. We were right near the crossing, just waiting for the train to pass. Mr. Gunn was just bringing me in here to Houston to take a music lesson. We were riding along in an automobile, and Mr. Gunn and I were talking. I say we ran up there one morning; we stopped and waited for the train to pass. I don't know how close it was to the track when Mr. Gunn decided to stop, but it was pretty close to the track. It was somewhere right in there after we made the turn, of course I don't remember just where, but it was pretty close. The road runs parallel with the railroad track, and just before you get to the crossing it makes a turn to the left. Just after Mr. Gunn and I had made this turn to our left we stopped and waited for the train. We saw the train coming. We were always looking for it. It was hard to see it. When we looked for it we saw it—in some places. Well, no, I never passed there

when there was a train coming when I looked for it and did not see it. We could see if we would take our time, and would always look for it, but there was some places you could not see it at all. If it was very close we could see it lots of times. I don't suppose I have ever passed there in my life when there was a train coming but what I saw it. I suppose every time I passed that crossing and there was a train coming I saw it. I don't know, I think I have. When Mr. Gunn and I got to this crossing we looked for a train. We were expecting one. When I reach a railroad crossing and see that there is a railroad crossing, sometimes I expect to see a train, but some crossings you have to get almost upon the crossing before you see the train. I tried to always look before I got on it. In some places I saw it when I looked and in some places I could not. I never got hit at El Buey crossing. I have crossed there lots of times and seen trains coming. Every time I got to that crossing and there was a train coming I always saw it. I saw it that morning that Mr. Gunn and I were coming in. We stopped just after we made the turn to let the train by. We stopped because we saw the train, but we couldn't see it very plain. I knew what it was. I saw the train; I know it was a train. I knew it would hit us if we didn't get off the track in time, or if we kept on going, and we stopped and let it by. We did not stop that morning and take into consideration how close we were to the track—to see how close we could get to the track and stop. We never thought about how close we ran to the track, because we knew it was a safe distance. Of course we were close. We were close when we were riding along there parallel too, but not as close. We never had an occasion to measure and see how close we stopped that morning; never thought about it that morning to see how close we stopped. We were just driving along and looked down and saw the train, and stopped and waited until it went by. We saw the train just as we got there. We were driving very slow. No, it didn't get us. When we saw the train, we stood there and watched it, and it went by. Of course we saw the train a little before we stopped. I think Mr. Gunn saw the train. He was driving, and it was a left-hand car. Those trees down there on the bayou do keep you from seeing the train a good ways off; oh, you can't hardly see it from there; it seems to blend in some way; it is always dark. After we got close up, they didn't keep us from seeing that engine. The trees that are behind the engine didn't keep us from seeing it; you cannot usually see it as plain; it is always dark—but that didn't keep us from seeing it. There was one large one, and I think two or three small ones. Some were near the Sinclair fence, but some were on the right-hand side of the road. The road turns, there is another road goes straight out to a house in the field, and there is a big gate in the Sinclair fence. West from the Sinclair gate, that is, towards Houston, is where the signs were, the ones I am speaking of, not at the gate, but between there and the railroad fence (meaning the gate). I said just then I think there was two or three small ones, and I know there was one large one."

Mr. L. L. Hargraves testified as follows:

"In September, 1920, there was quite a bit of underbrush grown up there on the right of way, and there is right now, poison oak is what I call it, on the fence. It is, I judge, about 5 feet high now. I guess you would call that fence the Sinclair fence; it might be a railroad fence. In September, 1920, coming from Houston to Pasadena, as you approach that El Buey crossing going towards Pasadena, there were some signboards in there that obstructed or tended to obstruct your view of trains that approached the crossing from towards Houston. There was also the high fence and then that underbrush. These signboards I am talking about are on this cross fence between the cattle guard and the Sinclair fence. I mean there were sign boards on this cross fence here right near the fence; they were near the fence between the cattle guard and the Sinclair fence. I don't know exactly how far they were from the cattle guard. I don't know how many signboards or billboards there were between the cattle guard and the Sinclair fence on this cross fence; there might have been two, three, or four; I never paid much attention to them at the time. That looks similar to the billboards and signboards as they were in 1920. I judge those boards were 7 or 8 feet high. I couldn't say whether they went to the ground or not. I don't know how long they were, I didn't have occasion to measure them. If you get up close to anything that is 9 feet high, or anywhere near it, you cannot see. That jog (meaning the jog in the fence), where the vines are, is about 25 or 50 feet from the crossing. Standing in the public road, and looking west and seeing vines 9 feet high, you can see part of the engine that is 14 feet high. If you are looking for an engine, you can tell what it is. If you are looking for it, you can see enough of it to tell it is an engine and not a playhouse. Putting the time between 8 and 11 o'clock, and then putting it between 4 and 6 o'clock in the evening, with the sun shining, coming down this road from Pasadena, when you strike those dark, gloomy, brown trees down there, you can see from the window of the engine up. You cannot see from the window down because this underbrush will hide it. After the engine passes over that little creek, and comes up a little way from that and gets between those trees and that crossing, regardless of those trees back down there, if you are looking for the engine you can see it, if you are looking for those trees you can see them. Those trees would not keep you from seeing an engine, if the engine was between you and those trees. Standing there in the road anywhere, after the engine passes those trees and gets out, you can see from the window up of the engine. I mean that is the window where the engineer and fireman sit. If you are looking for an engine, you can see enough to tell you it is an engine. If you are looking for an engine and see that window, and see that cab and the window in that cab, that is enough to tell you that a locomotive engine is coming. If you look, you can see it."

Mr. R. A. Burch testified as follows:

"In traveling from Pasadena towards Houston, I have had occasion to observe the condition existing at the right of way as you come towards Houston. Along about September 2, 1920, at the time of this accident, there were some signboards there. (Counsel explained the different points on the blueprint heretofore used.)

This from 'G' to 'D' and on represents the Sinclair woven wire fence. ·I suppose those signboards I saw were right along there (at point marked 'O'). There were also some signboards sitting back along in here (towards Pasadena) along this line of fence. I don't know whether they were on the other side or this side. There were also two or three signboards right along here together; then there was one farther down, just about straight with this road here (county road, referring to photograph marked 'C'). Those are some of the signboards I saw on the date of this accident. I am pretty sure there was more signboards there than I see in the picture; in fact, I am sure there was. There were two or three signboards; I don't know how many there were, but scattered all along, different signboards. (Counsel explained the location of Sinclair' and right of way fence on blueprint). Well, I am pretty sure there wasn't any signboards inside of this tence; they were right along about the corner. ·

"Q. Right at the corner back of the Sinclair fence—this shows it here, if you will look—there is one there that shows the corner post of the right of way fence, and those others are back right in there where you mark. Now, isn't that practically correct as you remember it (referring to picture marked 'D')? A. Evidently that is true. I am sure there wasn't any bill posts from the right of way to the cattle guard. Before going out there I had no idea how far a man could see an engine; I had never had occasion to see a train, but after I went back and made the actual experiment, standing in the road and looking to the left of the right of way fence, I could see an engine 150 yards. Standing there, I could see that engine all the way as it came up the track. You could see the engine as far one place as you could another; I saw it all the time. When I came in 20 feet of the track, I could see it right down the track nearly to Simms Bayou."

Mr. J. G. Brill testified as follows:

"* * * It bothered me; it did one time. That was about a month before this happened. I suppose that was some time in August. When I say it bothered me, I will tell the jury what I mean: It was a short train, looked like a switch engine, it may have had one car on it, but not over that; it was coming, and it got in there before I seen it; I was going, I expect, 20 miles an hour, and it was already in that space before I knew it. I saw I could not make it across, and I went straight, and as I did I hooked up in the sign right there, that is where I went. I turned to'the right, and went right down by that sign. I say I was going about 20 miles an hour that time I got bothered. I didn't see the train coming; you couldn't see it. After I got right up on it, I seen it and went straight, you see. If I had made the turn, I might have made it across the track, but I did not make the turn; I went straight, almost to that sign there. I saw it before I got to the turn. The engine was probably 300 feet from the crossing. The turn is right at the crossing. Yes; that is it. I said 30 feet from the fence. Yes; it is more than 30 feet from the road to the crossing, but I did not take the chance of turning, I landed down here. It may be 75 or 80 feet from there to there (indicating), but it didn't seem to me ·that day. I just went

straight on. I saw ·that engine with even· that dark background of some trees down there at Simms Bayou. I saw it when I was just about 100 feet from the'crossing; the train was about 300 feet from the crossing.. I did not want to take a chance of making that 100 feet while the engine was making 300, and I went straight on; I took my chance with the bill-·board rather than an engine. That bothered me. I know I won't get bothered any more. I will never forget it."

Plaintiff, Max Freeman, testified:

"When I was in 10 feet of the track, I was not in any danger, if I could see the train. Of course I was not in any danger. If when I was in 6 feet of the track if I had' seen the train I would not 'have been in any danger. Absolutely, if I had seen the train, I would have stopped. When I was within 10 feet of the track, the billboards were there to keep me from seeing it. Naturally all that stuff you had there, it would keep anybody from seeing the train. The billboards and what you had there combined kept me from seeing the train in 10 feet of the track. I don't know what kept me from· seeing the train. I looked, and I did not see the train. I could not say how many feet I was away, but I looked for the train, and did not see it. I could not say the number of feet, but anywheres in that neighborhood your view was obstructed. You could not see a train if you tried."

Notwithstanding, however, the additional finding of facts, we are not prepared to hold that the judgment is so, against the weight and preponderance of the evidence as to be clearly wrong. To the foregoing conclusion we all agree.

By its motion for rehearing appellant also insists that this court erred in refusing to sustain its assignment complaining ·of the refusal of the trial court to submit certain special issues, requested by it in writing, and in due time, among which was its special requested issue No. 12, which reads as follows:

"Could the plaintiff, Max Freeman,. when within a sufficient distance from the track that he could have stopped his automobile before reaching the track, by the exercise of ordinary care, have seen or heard the approaching train by looking or listening for same?"

Following the request for the submission of, its group of issues, shown to be 11 in number, appellant requested the court to give to the jury the following instruction (same being numbered 13):

"If you have answered special issues 1, 2, 3, 8, 9, 10, and 11 in the affirmative, or either of them, then you will answer the following question: Was such failure upon the part of the plaintiff a contributing cause to 'plaintiff's injuries?"

Special issue No. 9, submitted by the court with reference to the care used by the plaintiff in an attempt to discover the approach of the train, was in general terms as follows:

"Did the plaintiff in approaching the railroad crossing on the occasion in question fail to use the care that a man of ordinary prudence under the same or similar circumstances would have used to discover the approach of the train and avoid collision therewith?"

In due time appellant filed its exception to such charge, "in that it submits the issue of contributory negligence in the most general way possible, and that, the case having been submitted on special issues, the defendant is entitled to have the court submit each issue of fact affirmatively that goes to constitute the plaintiff's negligence, and the court cannot submit contributory negligence in general terms."

It is clearly apparent, we think, that counsel for appellant intended by its requested charge No. 13 to cover all of his special requested charges, including his No. 12, which is shown by the group to be the eleventh requested charge. It could but have been so understood by the court. There is no ground, we think, for any other conclusion.

The majority of the court feels constrained to sustain the complaint so made and to grant the motion for rehearing, and, for reason of such error of the trial court, to set aside our former order of affirmance and to now reverse the judgment of the trial court and remand the cause.

[4] The undisputed evidence shows that the plaintiff knew that he was approaching, and was about to cross, a railway track at a point where many trains pass daily. Under these circumstances it was his duty to use ordinary care to ascertain whether a train was approaching the crossing before he went upon the track. A failure to look and listen for such train, at such time and place, as he should have reasonably expected to ascertain whether there was, or not, a train approaching before going upon the track, would constitute an act of negligence which, if it contributed to and was the proximate cause of his injuries, would bar his recovery, unless he could recover under proof of discovered peril.

It is well settled, we think, by a uniform holding of our courts, that if one about to cross over a railway track over which he knows trains frequently pass fails to look or listen for a train which might be approaching, at some point where he might reasonably expect to discover the same, such failure would constitute an act of negligence which would bar his recovery for an injury which he might receive by being struck by such train, unless he might do so under proof of discovered peril on the part of the railway company.

[5] There was much evidence, we think, which would support a finding that, had the plaintiff looked or listened for the train which struck him, at some point where he could reasonably have expected to discover its approach, he would have seen the same in time to have stopped his automobile and have avoided the accident. The majority of this court therefore thinks that the trial court erred in refusing to submit to the jury appellant's requested issue numbered 12 but which was in fact No. 11, hereinbefore set out.

It was the duty of the trial court upon request so to do to submit separately each group of facts relied on by defendant under the evidence, tending to show contributory negligence, notwithstanding the fact that defendant had charged contributory negligence in general terms. Article 1984a, Vernon's Sayles' Civil Statutes, 1914. Fox v. Dallas Hotel Co., 111 Tex. 461, 240 S. W. 517; same case (Tex. Civ. App.) 196 S. W. 647; G. C. & S. F. Ry. Co. v. Mangham, 95 Tex. 413, 67 S. W. 765; Bell v. G. C. & S. F. Ry. Co. (Tex. Civ. App.) 81 S. W. 134; Stewart v. G. H. & S. A. Ry. Co., 34 Tex. Civ. App. 370, 78 S. W. 979.

We quote from the cases cited as follows:

Railway Co. v. Mangham: "A plea of contributory negligence in general terms, not setting forth the particular default in care constituting the negligence, is sufficient, if not excepted to, to admit proof of the particulars, and to entitle defendant to a requested instruction grouping such particular facts establishing the defense and declaring their legal effect."

Bell v. Railway Co.: "The appellee, in its plea of contributory negligence, did not particularize, but generally charged that the plaintiff was guilty of contributory negligence in undertaking to use the benches or trestles referred to, for the purposes mentioned in the petition.

"We regard this as a general averment of contributory negligence that arose from the use of the benches. It was not excepted to, and under the rule as we understood it, the defendant could prove any fact showing contributory negligence that resulted from the use of the benches."

Stewart v. Railway Co., writ of error denied by the Supreme Court: "Defendant pleaded general denial, and specially 'that plaintiff was guilty of negligence at and before his injuries which was the direct and proximate cause of the same.' The portion in quotation marks is the language of the plea."

In the case last cited the contention was made that the general plea of contributory negligence did not authorize or require the court to submit affirmatively the different issues of negligence disclosed by the evidence. Disposing of such contention, the court said:

"A general plea of contributory negligence, not excepted to, is undoubtedly sufficient to warrant its submission generally or in any and all forms in which the issue is made by the evidence."

In Fox v. Dallas Hotel Co. our Supreme Court said:

"The trial court disregarded the mandatory provisions of articles 1971, 1984a, and 1985, Vernon's Sayles' Texas Civil Statutes, in the

charges given and refused, in submitting the issues of contributory negligence raised by the pleadings of defendant in error. For that reason, no other proper judgment could have been rendered by the Court of Civil Appeals than to reverse the judgment of the trial court and to remand the case for a new trial.

"The statutes make it the duty of the court in trials by jury: First, to submit all the controverted fact issues made by the pleadings; second, to submit each issue distinctly and separately, avoiding all intermingling; and, third, to give such explanation and definition of legal terms as shall be necessary to enable the jury to answer each issue.

"Each group of facts pleaded by defendant in error, which, standing alone, would, if proven, constitute a complete defense to plaintiff in error's suit, presented an issue. It was the statutory right of defendant in error to have the issue presented by each complete plea submitted separately to the jury, just as plaintiff in error had the right to have submitted each issue, entitling her to recover, which she pleaded and proved. The court submitted separately, as the statute required, each group of facts relied on by plaintiff in error, under her pleadings and the evidence, to constitute negligence on the part of defendant in error. The court, over the objection of defendant in error, refused to submit separately each group of facts relied on by defendant in error, under its pleadings and the evidence, to constitute contributory negligence on the part of Alexander Fox."

We all concur in the conclusion that our construction of the decision in the Fox Case was erroneous.

The majority of this court has reached the conclusion that in refusing to give the requested charge No. 12, hereinbefore set out, the trial court committed reversible error, and, having so concluded, it becomes our duty to reverse the judgment and to remand the cause, which is accordingly so ordered.

Justice GRAVES, however, dissents from the conclusions last mentioned.

Reversed and remanded.

GRAVES, J. (dissenting). In dissenting, I affirm the correctness of our original disposition of the cause and of the opinion then rendered, with the single exception of this recitation in it:

"To entitle it (appellant) to have them (its refused special issues relating to contributory negligence) singled out, and presented to the jury as the specific basis for affirmative relief, as we read the Fox Case, it was necessary to specifically plead them."

The authorities applying a different rule, to which we all have yielded on rehearing, as Judge LANE correctly states, were neither cited nor called to the court's attention on first hearing. In no other respect, however, than that the opinion in the Fox Case, 111 Tex. 461, 240 S. W. 517, may not perhaps have been intended to prescribe generally the rule it there so plainly lays down concerning the necessity of restricting the special issues on contributory negligence "to specific acts of negligence alleged and proven" do I concede that any misconstruction of it was before indulged in.

While the matter may be of no significance, I also think that, in connection with the additional testimony inserted on rehearing with the concurrence of us all, Judge LANE'S findings with respect to the general course of the railroad, the dirt road, and conditions at and adjacent to the crossing of the two, are in some particulars inaccurate, for instance, the two highways along there running, as I understand it, east and west, instead of north and south, as stated.

As the original opinion fully discusses the question raised by the refused special issue, upon which alone the reversal is now ordered, further discussion is forborne.

I think the motion for rehearing should have been overruled.